**David A. JOHNSON, Plaintiff,**

**v.**

**CITY OF WICHITA; Gene Denton; Robert Finch; John Wynkoop; Robert Brown, Tony Casado, Robert Knight, Albert Kirk, and Margalee Wright, Members of the Wichita City Commission; Sam Rothe, Employee Relations Officer; Captain Mike Hill, Head of the Wichita Police Department Special Investigations Section; Walter Trombold, Merlyn Hatcher, Willa Wultz and Edward Francis, Members of the Termination Committee; and all Other Persons Succeeding to or Acting in the Offices of Official Capacity of the Above Named and Their Agents, Subordinates and Employees, Defendants.**

No. 85–1994–K.

United States District Court,
D. Kansas.

May 25, 1988.

Shannon S. Krysl, Wichita, Kan., for plaintiff.

Gary E. Rebenstorf, Asst. City Atty., Wichita, Kan., for defendants.

## MEMORANDUM AND ORDER

PATRICK F. KELLY, District Judge.

This is a civil rights action brought pursuant to 42 U.S.C. § 1983 in which the former Operations Chief Engineer of the City of Wichita Water Department alleges the circumstances of his termination violated his rights under the First, Fourth, Fifth and Fourteenth Amendments. Plaintiff additionally alleges pendent state claims of defamation and invasion of privacy. Defendants are the City of Wichita, the City Manager, the Deputy City Manager, the Director of the Water Department, the Employee Relations Officer, the Head of the Police Department's Special Investigation Section, the members of the City's Personnel Advisory Board, and members of the City Commission.

Defendants have collectively brought the present action for summary judgment arguing no material issue of fact exists and that plaintiff cannot establish a deprivation of any constitutional rights under 42 U.S.C. § 1983.

The court, after hearing oral argument on defendants' motion and examining the memoranda and supporting documents filed by the parties, finds that summary judgment for the defendants should be granted.

 Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering such a motion, this court must examine all evidence in a light most favorable to the opposing party. *Weir v. Anaconda Co.*, 773 F.2d 1073, 1079 (10th Cir.1985). Further, the party moving for summary judgment must demonstrate its entitlement beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir.1985). However, the moving party need not disprove plaintiff's claim, but rather, must only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir.1987).

Once the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538, 552 (quoting Fed.R. Civ.P. 56(e)). Moreover, one of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24,

106 S.Ct. 2548, 2553, 91 L.Ed.2d 265, 274 (1986).

The following facts are material and uncontroverted:

Plaintiff David Johnson was employed by the City of Wichita from November 20, 1961 until his termination on October 23, 1984. Prior to his termination, Johnson served in the position of Chief Engineer, Water Transmission and Distribution Division, of the City Water Department. Johnson was a division head who reported directly to the Director of the Water Department, defendant John Wynkoop.

In addition to his employment with the City, plaintiff also operated a construction business, J & O Construction Company, as an equal partner with Stan Olson. The company operated from 1978 to 1985, and during that time built approximately 29 residential homes.

On September 23, 1984, an advertisement appeared in the Wichita Eagle–Beacon indicating that certain home builders had bond money available through Mid Kansas Federal Savings and Loan Association (Mid Kansas) for homes in a target area. The plaintiff's name was listed in the advertisement along with a phone number which was one of four business numbers for the City Water Department. The bond money advertisement involved mortgage revenue bonds issued by the City on behalf of financial institutions to stimulate and lower the cost of housing.

Approximately one to two weeks after the advertisement appeared, it was brought to the attention of defendant Wynkoop. Wynkoop questioned Johnson about the ad and about Johnson's involvement in its publication. Johnson denied any knowledge or involvement in the matter, and stated that someone from Mid Kansas had placed the Water Department's phone number in the advertisement without Johnson's permission. Plaintiff theorized that Mid Kansas may have used this number because plaintiff's construction company periodically filed credit applications with Mid Kansas, and Johnson always put the Water Department's number on the application as his "work number".

Prior to October 3, 1984, a number of city employees had complained to Art Veach, the representative of the recognized bargaining unit for certain city employees, regarding the appearance of Johnson's name and the Water Department phone number in the bond money advertisement. Further, even prior to the advertisement's publication in the Eagle–Beacon, Veach had received several complaints from Water Department employees regarding Johnson's alleged use of city time, materials and equipment for his personal construction business. On October 3, 1984, Veach advised the City Employee Relations Officer, Sam Rothe, of these complaints. He further advised Rothe that a local television station was currently investigating Johnson's activities.

Rothe reported these allegations to Ace Todd, the City's Acting Personnel Director, who in turn passed the information on to defendant Robert Finch, who was acting as City Manager while Gene Denton was out of town. Finch contacted the Wichita Police Department and requested they conduct a criminal investigation. The investigation was assigned to the Special Investigation Section supervised by Mike Hill.

On either October 4, 1984 or October 5, 1984, Wynkoop met with Johnson in Wynkoop's office and advised him that complaints had been registered against Johnson and that a criminal and administrative investigation would begin the following Monday, October 8. When Wynkoop questioned plaintiff as to whether he had any problems with the investigation, Johnson responded that he welcomed the investigation as it might clear up the hearsay that had been "going around" about him.

During the period from October 8–16, Doyle Dyer, of the Police Department, conducted a criminal investigation of Johnson's activities while Rothe conducted an administrative investigation. Doyle and Rothe interviewed approximately 25 to 30 persons, including both retired and current Water Department employees, and compiled substantial information regarding the use by Johnson of city time, personnel and equipment for his personal use. In his

offense report of October 16, 1984, Dyer concluded that Johnson was "not involved in any criminal activity." However, in an "Additional Information Report", Dyer stated:

If the statute of limitations didn't expire, there is a strong possibility that Mr. Johnson could have been charged for theft of property and possible theft of time, however, it would be very hard to prove how much time he would have stolen. Due to the fact the only things that we could vertify [sic] happened over four years ago, there will be no criminal charges filed at this time against Mr. Johnson.

On October 16, 1984, Finch met with Dyer, Rothe and Detective Hill. During the meeting, Finch took notes of the details and findings of the investigations by Rothe and Dyer of Johnson's activities. These findings included: (1) Johnson received approximately 12 phone calls per day at the Water Department which related to his construction business; (2) Johnson maintained a two-drawer file cabinet devoted to his construction business in his City Water Department office; (3) the Water Department phone number was listed in the bond advertisement as well as in the Wichita Area Builders Association Directory under J & O Construction's listing; (4) Johnson used city materials, equipment and supplies in his construction business and spent city time on a daily basis at the construction company's job sites; and (5) no criminal charges would be filed against Johnson because the statute had already run.

Following this meeting, Finch discussed the information obtained from the investigations with Wynkoop, and Wynkoop obtained a copy of Finch's notes from the meeting.

From October 10–18, 1984, Johnson vacationed in Colorado. Upon returning home, he retained an attorney, Jim Hernandez, to represent him. On the advice of Hernandez, Johnson called Wynkoop at home on Saturday, October 20. Wynkoop asked Johnson to come to Wynkoop's home to discuss the allegations against Johnson. At that meeting, which lasted approximately two hours, Wynkoop discussed with Johnson the results of the criminal and administrative investigations and the various allegations against Johnson. Johnson was given an opportunity to respond to the allegations raised by Wynkoop. At the conclusion of the meeting, Wynkoop informed plaintiff that he (Wynkoop) was going to meet with the investigative team on Monday, October 22, 1984, to go over the information firsthand and ask them to document the allegations.

As promised, Wynkoop met with the investigators on October 22, 1984. Following this meeting, Wynkoop and Johnson again met, this time in Wynkoop's office. At that meeting, Wynkoop informed Johnson that he (Wynkoop) had information from the investigation and had reason to believe the allegations against Johnson were true. Wynkoop gave plaintiff the opportunity to resign or be terminated. Plaintiff refused to resign. Accordingly, on October 23, 1984, Wynkoop prepared a termination letter which was hand delivered to Johnson at his home. The letter stated in pertinent part:

Your termination is the result of your conducting private business during city working hours and my loss of confidence in your ability to be an effective administrator. This action is based upon the just completed administrative investigation of the activities of your division.

The following day, the City issued a news release stating that Johnson had been terminated and that his termination arose "under the administrative and personnel regulations of the city and is considered an internal personnel matter."

Johnson subsequently filed a grievance concerning his termination pursuant to the City's Personnel Manual, which provided a grievance procedure for city employees not covered by union agreements.

In a letter to Johnson's counsel dated November 1, 1984, City Attorney Gary Rebenstorf offered plaintiff a name-clearing hearing. The letter stated that the purpose of such a hearing was to provide Johnson "with an opportunity to clear his name if he feels false information was publicized in

relation to his termination." Further, the letter explained that a name-clearing hearing would be open to the public and could be combined with a grievance hearing which normally is not open to the public. Johnson, upon receiving this letter, discussed the matter with his attorney, but he did not respond or request a name-clearing hearing at that time.

On December 3, 1984, City Manager Gene Denton sent a letter to Johnson advising him that Ace Todd had conducted an investigation of the circumstances surrounding Johnson's dismissal, and that Todd had found sufficient justification to sustain Wynkoop's termination decision. Denton advised plaintiff his termination was affirmed and his grievance was denied.

On December 7, 1984, plaintiff submitted a letter to Ace Todd, giving notice of his intent to appeal his grievance to the Personnel Advisory Board. The City's grievance procedure provides that an employee may make such an appeal after receipt of a letter from the city manager denying a grievance after a factfinding investigation.

Plaintiff's grievance hearing began before the Personnel Advisory Board on January 16, 1985. Further proceedings were held on January 17, February 13, February 14, and February 26, 1985. Board members Walter Trumbold, Merlyn Hatcher, Willa Wulz and Edward Francis heard plaintiff's grievance and are named defendants in the instant action.

Prior to the hearing, the investigative reports of Dyer, Rothe and Todd were given to the board members by Ace Todd. Consequently, at the outset of the grievance hearing, plaintiff's counsel argued the board members had been prejudiced by receiving the reports and requested that the board members disqualify themselves. The Board denied plaintiff's request.

During the course of plaintiff's grievance hearing, plaintiff was represented by counsel, and plaintiff's counsel was permitted to present opening and closing statements, to cross-examine witnesses, to present witnesses on plaintiff's behalf, and to register objections.

On February 27, 1985, the Board presented its findings to City Manager Denton. The Board found that Johnson's termination was justified and that no evidence was presented to support Johnson's grievance.

Following the Board's decision to uphold Johnson's termination, Johnson filed the instant action against the City of Wichita, Gene Denton, Robert Finch, John Wynkoop, Sam Rothe, Mike Hill, the members of the City Commission and the members of the Personnel Advisory Board. Johnson claims his termination and the events surrounding it violated his First, Fourth, Fifth and Fourteenth Amendment rights.

Additional facts will be discussed where relevant.

Plaintiff first alleges the manner in which he was terminated violated his Fourteenth Amendment right to procedural due process of law. The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property. *Board of Regents v. Roth*, 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). Thus, the court must first determine whether plaintiff had a protected liberty or property interest in this case.

*Property Interest*

A protected property interest in a particular benefit exists only if one has a legitimate claim of entitlement to it. *Board of Regents v. Roth*, 408 U.S. at 577, 92 S.Ct. at 2709. Property interests are not created by the Constitution, but arise from independent sources such as state statutes, local ordinances, established rules, or mutually explicit understandings. *Perry v. Sindermann*, 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972); *Dickeson v. Quarberg*, 844 F.2d 1435, 1437–38 (10th Cir.1988). Thus, if Johnson had a "legitimate claim of entitlement" to his continued employment under Kansas law, then he had a protectible property interest and the court must then consider whether the procedures utilized in terminating plaintiff's interest violated constitutional standards as a matter of law.

It is undisputed that Johnson did not have a written employment contract. However, Johnson argues he had an "implied-in-fact" contract with the City. A property interest in employment can be created by such a contract. *Bishop v. Wood*, 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976). Thus, the court must determine whether, under Kansas law, a constitutionally protected property interest can arise despite the absence of a statute or formal contract.

Kansas has traditionally adhered to the employment-at-will doctrine. Under this rule, in the absence of a contract, express or implied, covering the duration of employment, the employment is terminable at the will of either party, and no action for discharging the employee from service can be maintained against the employer. *Johnson v. Nat'l Beef Packing Co.*, 220 Kan. 52, 54, 551 P.2d 779 (1976); *Swart v. Huston*, 154 Kan. 182, 117 P.2d 576 (1941).

However, the Kansas Supreme Court has recognized that an exception to the at-will doctrine may exist where employees can show an "implied-in-fact" contract. Most recently, in *Morriss v. Coleman Co.*, 241 Kan. 501, 738 P.2d 841 (1987), the court found a genuine issue of fact precluded summary judgment as to whether the plaintiffs' employment had been terminated in violation of an implied contract. Plaintiffs in *Morriss* argued that a number of factors indicated an "implied-in-fact" contract including (1) a statement in Coleman's personnel manual that Coleman would not discharge its employees except for "good cause"; (2) verbal and nonverbal conduct on the part of Coleman's supervisors; and (3) Coleman's established policies in dealing with its employees. 241 Kan. at 513, 738 P.2d 841.

In holding that an issue of fact existed as to whether there was an implied contract, the *Morriss* court cited the following language from *Allegri v. Providence–St. Margaret Health Center*, 9 Kan.App.2d 659, Syl. ¶ 5, 684 P.2d 1031 (1984):

> Where it is alleged that an employment contract is one to be based upon the theory of "implied in fact," the under-

standing and intent of the parties is to be ascertained from several factors which include written or oral negotiations, the conduct of the parties from the commencement of the employment relationship, the usages of the business, the situation and objective of the parties giving rise to the relationship, the nature of the employment, and any other circumstances surrounding the employment relationship which would tend to explain or make clear the intention of the parties at the time said employment commenced.

241 Kan. at 513, 738 P.2d 841.

This court recently held that pursuant to *Morriss*, the determination of whether an implied-in-fact employment contract exists generally involves a factual inquiry. *Derstein v. State of Kansas, et al.*, No. 84–1219–K, slip op. at 8 (D.Kan. Apr. 28, 1988) [available on WESTLAW, 1988 WL 66183].

In the instant case, Johnson argues that several facts support his contention that an implied contract existed; in particular, he points to city personnel regulations which provide employees can be discharged only for cause. Section VI(5) of the City of Wichita's Personnel Policy and Procedure Manual provides as follows:

> Dismissals may be made for inefficiency, insubordination, excessive absenteeism, habitual tardiness, improper attitude, falsification of records, fraud, theft, conviction of a felony, safety violations, or similar cause. A department director may at any time recommend to the appointing authority that an employee be dismissed.

Defendants contend that this provision of the personnel manual is insufficient, standing alone, to support plaintiff's implied contract theory. Defendants cite *Rouse v. People's Natural Gas Co.*, 605 F.Supp. 230, 232 (D.Kan.1985), in support of their contention. In *Rouse*, this court held that while an employment manual may be one of the relevant circumstances from which an implied contract can be inferred, it cannot alone be the basis of an employment contract where the manual is only a unilateral expression of company policy and is not bargained for between the employer and the employee. Defendants' contention

lacks merit for two reasons. First, *Rouse* is of questionable precedent in light of the Kansas Supreme Court's holding in *Morriss. See Boyd v. Doskocil Sausage Company*, 686 F.Supp. 875, 877–78 (D.Kan. 1988). Second, as in the *Derstein* case, cited above, the plaintiff here has presented evidence *in addition to* the employment manual. Specifically, plaintiff also cites his 23 years of continuous employment with the City, his prior favorable job evaluations, and his job promotions as evidence of an implied employment contract with the City.

Under these circumstances, the court finds there is sufficient evidence of an implied-in-fact contract to create a jury question. Accordingly, the court will proceed with its analysis as if plaintiff did have a property interest in his continued employment.

*Liberty Interest*

Plaintiff next argues the circumstances of his termination also implicated his liberty interest.

 For an employee to make a successful liberty deprivation claim, he must show that his termination resulted in the publication of information which was false and stigmatizing, and which foreclosed his freedom to take advantage of other employment opportunities. *Sipes v. United States*, 744 F.2d 1418, 1421–22 (10th Cir. 1984); *Polson v. Davis*, 635 F.Supp. 1130, 1141–42 (D.Kan.1986). The liberty concept recognizes two particular interests of a public employee: (1) the protection of his good name, reputation, honor and integrity; and (2) freedom to take advantage of other employment opportunities. *Walker v. United States*, 744 F.2d 67, 69 (10th Cir. 1984); *Miller v. City of Mission*, 705 F.2d 368, 373 (10th Cir.1983). *See also Wulf v. City of Wichita*, 644 F.Supp. 1211 (D.Kan. 1986).

 A number of articles published in the Wichita Eagle–Beacon lend support to plaintiff's allegation that his liberty interest was implicated. First, an article which appeared on October 12, 1984, discusses the police investigation of complaints against an unnamed Water Department employee. The article quotes City Manager Gene Denton as saying the investigation "involves the alleged misuse of city time, materials and equipment," and that "at this point the individual has not been charged." The article also quotes Police Captain Mike Hill as stating that the police have been working on the case for over a month and "if there is some criminal wrongdoing, we'll proceed in that direction."

A second article in the Eagle–Beacon, dated October 18, 1984, concluded "no criminal charges will be filed against [David Johnson]." However, the article states that while police investigated reports that Johnson may have been involved in the "theft of water department supplies, they concluded there was no evidence that any thefts had occurred in the past two years." Further, the article quotes city police as saying because the statute had run, any action stemming from the investigation would have to come from city officials.

On Wednesday, October 24, 1984, an article appeared in the newspaper announcing that Johnson had been fired "because he had broken city rules." This article quotes Police Captain Mike Hill as saying the police investigation could find no evidence of criminal conduct by Johnson "within the past two years" and the statute of limitations would prevent prosecution if illegal acts were committed before that time.

Finally, on October 26, 1984, the Eagle–Beacon quoted City Manager Denton as saying that some Water Department employees who had been reluctant to be interviewed by police before Johnson lost his job had come forward with new information about his activities.

These articles, as well as similar television reports, could all be interpreted to imply that Johnson committed criminal acts but that prosecution for such acts was prevented by the two-year statute of limitations. Such information clearly calls into question Johnson's "good name, honor and integrity." *See, e.g., Eames v. City of Logan*, 762 F.2d 83, 85 (10th Cir.1985) ("aura of suspicion" as to possible misconduct and criminal charges relating to the

performance of plaintiff's duties was sufficient to allege violation of plaintiff's liberty interest); *Walker v. United States,* 744 F.2d at 69 (appellant's liberty interest was implicated where he was accused of lying on a government employment application); *Polson v. Davis,* 635 F.Supp. at 1142 (liberty interest implicated where plaintiff charged with "unprofessional conduct"). Further, a material issue of fact remains as to the falsity of such information and its effect upon Johnson's future employment opportunities.

Accordingly, the court finds questions of fact remain as to the issue of whether the circumstances of plaintiff's termination violated his liberty interest.

### Due Process

■ Assuming that plaintiff had a property interest in his continued employment and that the circumstances of his termination implicated his liberty interest, the court must next consider whether the procedures employed in terminating plaintiff met constitutional requirements of due process as a matter of law.

The essential requirements of due process are notice and an opportunity to respond. *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). Where protected interests are implicated, the right to "some kind of hearing" *prior* to dismissal is paramount. *Board of Regents v. Roth,* 408 U.S. at 569–70, 92 S.Ct. at 2705.

Plaintiff contends he was not provided with due process because (1) he did not receive a pretermination hearing; (2) the post-termination hearing was not open to the public; and (3) the members of the Personnel Advisory Board were biased against plaintiff.

The procedural requisites of a *pretermination* hearing were discussed in *Cleveland Board of Education v. Loudermill,* 470 U.S. at 545–46, 105 S.Ct. at 1495, as follows:

[T]he pretermination "hearing," though necessary, need not be elaborate. We have pointed out that "[t]he formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and *the nature of the subsequent proceedings.*" In general, "something less" than a full evidentiary hearing is sufficient prior to adverse administrative action....

... Here, the pretermination hearing need not definitively resolve the propriety of the discharge. It should be an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action.

(Citations omitted; emphasis added).

In the instant case, defendants urge the court to find that plaintiff had a pretermination hearing as well as a post-termination hearing, and that such proceedings constituted due process as a matter of law.

While it is clear that Johnson did not have a formal pretermination hearing, the court agrees that he did receive the "some kind of hearing" contemplated by *Loudermill.* Johnson was initially advised by Wynkoop that complaints had been registered against him and that criminal and administrative investigations would be undertaken. Johnson responded that he "welcomed" such investigations as they presented an opportunity to clear up hearsay which had been "going around" about him. More importantly, prior to his termination, Johnson went to Wynkoop's home, where Wynkoop outlined the allegations against Johnson and permitted Johnson to respond to the allegations. Finally, it is significant that Johnson received a full, four-day, evidentiary-type, post-termination hearing in which he was represented by competent counsel. In *Loudermill,* the Court observed that "the existence of post-termination procedures is relevant to the necessary scope of pretermination procedures." 470 U.S. at 547 n. 12, 105 S.Ct. at 1496 n. 12. Moreover, other courts faced with similar factual circumstances have found pretermination procedures constitutionally sufficient under *Loudermill. See, e.g., Gniotek v. City of Philadelphia,* 808 F.2d 241 (3d Cir.1986), *cert. den.,* — U.S. ——, 107 S.Ct. 2183, 95 L.Ed.2d 839 (police officers given sufficient notice and oppor-

tunity to respond where notice of charges and nature of evidence against them were presented at predeprivation hearing); *Brasslett v. Cota,* 761 F.2d 827, 836 (1st Cir.1985) (town fire chief's pretermination hearing satisfied due process where he was notified of the possibility of discharge and afforded an opportunity to defend his actions during a one-hour conference with the town manager). But *cf. Morton v. Beyer,* 822 F.2d 364 (3d Cir.1987) (contemporaneous notice insufficient where a significant lapse of time occurred between alleged improper conduct and pretermination hearing).

Therefore, the court holds that the pretermination procedures received by Johnson satisfied due process requirements as a matter of law.

Plaintiff next suggests the 4–day grievance hearing did not satisfy the requirements of procedural due process because the hearing was not open to the public.

The court recognizes the right to a "name-clearing hearing" held by a government employee allegedly stigmatized in the course of his discharge. *Eames v. City of Logan,* 762 F.2d at 85. However, plaintiff has cited the court to no authority to support his allegation that such a hearing must be open to the public. Further, the facts show that the City offered Johnson a name-clearing hearing which would be open to the public, but Johnson did not respond to the offer. Thus, the court finds plaintiff's contention to be without merit.

Finally, plaintiff argues his grievance hearing did not satisfy due process because board members received the police and administrative investigations prior to the hearing and thus went into the hearing with "prejudiced minds."

The principle that a public employee facing a due process hearing is entitled to an impartial decisionmaker is well accepted. *See, e.g., Hortonville Joint School Dist. No. 1 v. Hortonville Education Assn,* 426 U.S. 482, 96 S.Ct. 2308, 49 L.Ed.2d 1 (1976). However, a substantial showing of personal bias is required to disqualify a hearing

officer or to obtain a ruling that a hearing is unfair. *Roberts v. Morton,* 549 F.2d 158 (10th Cir.1976), *cert. den.,* 434 U.S. 834, 98 S.Ct. 121, 54 L.Ed.2d 95. Further, an administrative decisionmaker is entitled to a presumption of honesty and integrity. *Withrow v. Larkin,* 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975).

Plaintiff's contention that the board members were "tainted" because they received the investigative reports prior to the hearing must fail. In a case directly on point, the Tenth Circuit recently held that a hearing panel's advance exposure to police reports is not sufficient basis for a procedural due process claim; nor is it sufficient to overcome *Withrow's* presumption of administrative regularity. *Mangels v. Pena,* 789 F.2d 836, 838 (10th Cir.1986).

Similarly, in the instant case, plaintiff has failed to overcome the presumption that decisionmakers will decide cases in accordance with the proper substantive and procedural rules.

While the record reveals the board did receive the investigative reports prior to the hearing, board members testified they did not consider such evidence in reaching their decision to uphold plaintiff's termination. Rather, the board relied upon the extensive evidence presented to it in a four-day evidentiary hearing.

The court finds as a matter of law that under the circumstances of this case plaintiff received all the process due him.

*Equal Protection*

Plaintiff next claims his right to equal protection under the Fourteenth Amendment was violated because the City does not equally enforce its dual employment policy and thus treats similarly situated employees differently.

The equal protection clause guarantees like treatment to persons similarly situated. *Cleburne v. Cleburne Living Center,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). A claim of denial of equal protection requires a showing of intentional or purposeful discriminatory conduct by a governmental entity. *Washing-*

*ton v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).

Plaintiff supports his claim of denial of equal protection by pointing out that a number of city employees have dual employment. Further, he contends those employees receive telephone calls at work relating to their private business.

The mere fact that other city employees had dual employment or received phone calls related to outside businesses does not show such employees were "similarly situated" to the plaintiff, *e.g.,* that they conducted a substantial amount of personal business on city time. Nor does it show intentional discrimination on the part of the City. This claim must fail.

### First Amendment

■ Plaintiff next asserts his termination was in retaliation for exercising his right to dual employment in violation of the first amendment.

As a government employee "speaking" in an employment context, to obtain first amendment protection plaintiff must prove both that his "speech" was on a matter of public concern and that his interest in speaking outweighed the government's interest, as an employer, in the "effective and efficient fulfillment of its responsibilities to the public." *Connick v. Myers,* 461 U.S. 138, 150, 103 S.Ct. 1684, 1692, 75 L.Ed. 2d 708 (1983). Further, plaintiff must establish that his constitutionally protected speech was a "substantial" or "motivating" factor in the defendants' decision to terminate his employment. *Mount Healthy City Board of Education v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977).

Here, plaintiff has failed to point the court to any facts which would indicate that (1) the pursuit of dual employment constitutes a "speech" activity; (2) that plaintiff's "speech" involved a matter of public concern; or (3) that plaintiff's pursuit of dual employment was a substantial or motivating factor in the City's decision to terminate him. Rather, the uncontroverted facts simply show that the plaintiff was terminated not because he pursued outside employment, but because defend-

ants believed Johnson was conducting his personal construction business on city time. Moreover, the city personnel manual specifically authorizes dual employment if it does not interfere with or affect performance of an employee's city job and availability to perform that job.

Therefore, the court finds as a matter of law that plaintiff's discharge did not violate his rights under the First Amendment.

### Fourth Amendment

■ In support of his next contention, that defendants violated his Fourth Amendment right to be free from unreasonable searches and seizures, plaintiff argues that city police officers and personnel officials conducted an investigation into the private business activities of plaintiff. As part of this investigation, plaintiff suggests that investigators went to construction sites of homes built by J & O Construction and made "secret inspections" after the houses had already been approved by city code inspectors.

It is well recognized that absent exigent circumstances, a private home may not be entered to conduct a search or to effect an arrest without a warrant. *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed. 2d 639 (1980). Further, the Fourth Amendment applies equally to administrative inspections of private commercial property as well as criminal searches. *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978). However, legislative schemes authorizing warrantless administrative searches of commercial property do not necessarily violate the Fourth Amendment, as the expectation of privacy that the owner of commercial property enjoys in such property differs significantly from the sanctity accorded an individual's home. *Donovan v. Dewey,* 452 U.S. 594, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981).

Even assuming that plaintiff had an expectation of privacy in the homes under construction, his claim of an unreasonable search must fail because there are simply no facts to support plaintiff's theory that police or administrative investigators searched the homes being built by J & O

Construction. Nor has plaintiff shown that the mere fact that police and administrative investigations were conducted is evidence of an illegal search.

This complaint is groundless and summary judgment is granted as to this issue.

Since no federal question jurisdiction remains, the court declines to exercise pendent jurisdiction over plaintiff's state law claims of defamation and invasion of privacy. *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).