Abdul WADUD, Plaintiff,

v.

Clinton WILLSIE, Individually and as
Director of the Sedgwick County De-
partment of Mental Health; and Sedg-
wick County, Kansas, Defendants.

No. 88–1227–K.

United States District Court,
D. Kansas.

July 31, 1989.

Brian Grace & Margaret Todd, Law Offices of Brian G. Grace, Wichita, Kan., for plaintiff.

Ed Keeley, of Crockett, Keeley & Gilhousen, Wichita, Kan., for defendants.

## MEMORANDUM AND ORDER

PATRICK F. KELLY, District Judge.

Plaintiff Abdul Wadud brought this civil rights action pursuant to 42 U.S.C. § 1983 against Sedgwick County and the director of the Sedgwick County Department of Mental Health, alleging violations of his constitutional rights under the First and Fourteenth Amendments. Specifically, plaintiff alleges (1) he was terminated from his position as Clinical Director of Sedg-wick County's South Mental Health Center because he exercised his first amendment right to free speech; and (2) the circumstances of his termination deprived him of a property interest without procedural due process. Plaintiff further asserts pendent state claims of breach of contract and retaliatory discharge. This case is currently before the court on the defendants' motion for summary judgment.

The court heard oral argument on defendants' motion on June 16, 1989 and reserved ruling at that time. After reviewing the briefs and supporting documentation filed by the parties, the court is now prepared to rule.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, this court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir.1988). Further, the party moving for summary judgment must demonstrate its entitlement beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir.1985). The moving party need not disprove plaintiff's claim, but rather, must only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir.1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations, or denials, contained in its pleadings or briefs. Rather, the moving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegations. *Burnette v. Dresser Industries, Inc.*, 849 F.2d 1277, 1284 (10th Cir.1988). One of the principal purposes of summary judgment is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpret-

ed in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1988).

### Findings of Fact

The facts relevant to a determination of this motion are as follows.

In a letter to Abdul Wadud dated January 21, 1974, defendant Clinton Willsie, as Director of the Sedgwick County Department of Mental Health ("the department"), confirmed Wadud's employment as a psychiatrist for the department at a starting salary of $34,404.00. According to the letter, plaintiff was to begin employment on May 1, 1974, or at an agreed upon time. Between March, 1974 and August, 1974, a series of letters were exchanged between Willsie and Wadud concerning Wadud's starting date. No mention was made in any of this correspondence of the duration of plaintiff's employment or whether plaintiff could engage in private practice while employed with the department.

On September 9, 1974, plaintiff advised Willsie in a letter that he could not accept employment with the department for undisclosed "personal reasons." While it is unclear from the record what happened in the intervening time period, on July 30, 1975, Willsie again wrote Wadud a letter confirming final approval of Wadud's employment by the department as a staff psychiatrist. The starting salary was to be $37,152.00, plus additional compensation for on-call responsibilities. Included with the letter was a county commission resolution showing plaintiff's employment to be effective September 1, 1975. Again, no mention was made in any of the written correspondence of the duration of plaintiff's employment or of any restriction on plaintiff's ability to engage in private practice.

On September 3, 1975, plaintiff indicated in a letter to Willsie that he would commence employment with the department in the first week of October. Plaintiff actually did begin his employment with the de-

partment on October 1, 1975. Wadud had no written contract of employment with the County.

At the time of his employment, plaintiff was advised orally by Willsie and/or Dr. Jehan (the chief clinical director for the department) that plaintiff could engage in private practice when not performing his duties with the department. At the time plaintiff was so advised, no rule or policy prohibited private practice by the department's professionals.

In 1976, the department adopted a written policy restricting the situations in which the department's staff could privately treat department patients. While the scope of the restriction is in dispute, it is undisputed that under the policy, a psychiatrist at either one of the department's mental health centers [1] could not treat a patient of that center in his private practice, except for those patients seen privately before the rule was adopted. In January, 1979, defendant Willsie circulated to all the department's professional staff a memorandum addressing the specifics of the private practice rule.

Wadud was promoted to the position of Clinical Director of the South Mental Health Center on July 1, 1977.

In a memorandum dated March 29, 1978, plaintiff was advised that he was a "classified exempt" employee for purposes of the county's personnel policies. Classified exempt employees were exempt from the normal county employment procedures, grievance rights, and termination policies that applied to classified employees. A copy of the personnel policy explaining plaintiff's classified exempt status was attached to the memorandum. (Pl.'s Depo. Ex. 12.)

In October, 1985, Willsie required the resignation of a department psychologist, Howard Brodsky, because Willsie believed Brodsky had violated the private practice rule by diverting a department patient to Brodsky's private practice.

---

**1.** The Sedgwick County Mental Health Center operates "North" and "South" mental health centers within the city of Wichita.

In November, 1985, the Mental Health Governing Board ("the board") adopted a rule prohibiting the department's full-time professional staff from engaging in private practice. The board decided that the prohibition against private practice would not take effect until June 1, 1986, in order to give the professionals time to wind down their practices. In recommending the adoption of the rule to the board, Willsie cited the difficulty of ascertaining conflicts of interest, the recent forced resignation of Howard Brodsky, and the loss of revenue which resulted when department patients were diverted to private practice.

When Wadud first heard of the new policy prohibiting private practice, he felt that it breached "the contract that [Wadud] had with the mental health center." (Wadud Depo., p. 63.) Willsie advised Wadud that he (Willsie) was going to recommend a raise in the psychiatrists' salaries to offset the loss of income from private practice, but Wadud told Dr. Jehan that he would not accept the raise because Wadud's income from private practice was much more than the compensation that he would receive from a salary increase.

Wadud decided that if the board did not reverse itself on the new private practice rule within six months, he would leave his employment with the department.

In December, 1985, plaintiff appeared before the board to inform the board of his belief that the new private practice rule constituted a breach of his contract.

Early in January, 1986, Wadud spoke with Dr. Richard Skibba, President of the Sedgwick County Medical Society. The medical society was not affiliated with the county's mental health department, but rather, consisted of a group of physicians that "looks at interests of the medical profession and also concerns about patients' care and delivery system in the community." (Wadud Depo., p. 141.) Wadud met privately with Skibba and advised him of the change in the private practice policy and that the standard of care was low at the department. Wadud also stated that the standard of care would further decline when private practice was discontinued and

the "physicians are totally controlled by the department" in "the income sense." (Wadud Depo., pp. 142–43.)

At its meeting of February 26, 1986, the board of directors of the medical society discussed the concerns Dr. Wadud had related to Dr. Skibba. The minutes of the meeting explain the board's action:

1. **MENTAL HEALTH CLINIC:** Dr. Skibba stated that he had discussed a concern raised by D. Abdul Wadud regarding the local mental health clinics' policy decision to eliminate allowing physician employees to participate in moonlighting activities. Dr. Wadud also questioned the quality of care being provided through the mental health clinics.

Dr. Skibba stated that he has discussed the quality of care issue with local psychiatrists, Neil Aldoroty, M.D., and Ron Erken, M.D. Dr. Skibba reviewed an evaluation report regarding the operations of the mental health clinic submitted by an Ohio evaluation group. Dr. Skibba also reviewed a letter received from the chairman of the Families for Mental Health which also raised concern regarding the overall operation of the local mental health clinics.

Dr. Skibba stated that it was his opinion, based on the above discussions and correspondence, that the mental health clinic's new policy proscribing physician employee moonlighting was an internal matter, which the Medical Society should not become involved in, in any way. In regard to the services provided through the clinics, Dr. Skibba stated both Dr. Neil Aldoroty and Dr. Ron Erken were of the opinion that the services provided through the local mental health clinics were as good as those provided in any governmental supported clinic setting.

**ACTION:** The Board recommended that a letter by Dr. Skibba be forwarded to Dr. Wadud and that no further action be taken regarding this matter at this time. (Pl.'s Depo. Ex. 26.)

Willsie was not aware of any of the complaints Wadud made to the Mental Health Association. However, Wadud had complained at various times to Willsie and

Dr. Jehan as well as to individuals outside the department about the quality of patient care at the department. Further, prior to his termination, Wadud, along with other professionals at the department, circulated a petition protesting the prohibition against private practice.

By letter dated January 3, 1986, defendant Willsie requested the legal advice of County Counselor William Rustin concerning a letter Willsie proposed to send to Wadud, which advised Wadud of what appeared to be a violation of the department's private practice rule. The proposed letter warned Wadud that if the allegation was true, he would immediately be terminated. (Willsie Depo. Ex. 8.)

In a memorandum dated January 23, 1986, Willsie directed Wadud to provide him with a full explanation concerning two "incidents" regarding Wadud's "past and present behavior." Specifically, Willsie referred to reports he had received from nurses that Wadud had "enthusiastically encouraged them to sign some petition" regarding the private practice prohibition. Willsie stated that the nurses claimed that Wadud threatened that "they [the nurses] would be next to have some right or privilege reversed and denied to them." Willsie advised Wadud in the letter that he considered such behavior "irresponsible, inflammatory, and most importantly gross insubordination." (Willsie Depo. Ex. 10.)

Further, Willsie discussed the details of a reported violation by Wadud of the rule prohibiting private practice. The purported violation apparently occurred in 1978, some two years after the rule was adopted prohibiting staff psychiatrists from seeing patients of the mental health center. According to Willsie's letter, Wadud had been seeing a patient by the name of Donald Ware for some time, and this patient, until 1978, had been served by the South Center. (Willsie Depo. Ex. 10.)

Finally, Willsie advised Wadud that he (Willsie) would await Wadud's response to the allegation and once a response was received, a decision would be made as to whether Wadud would remain on the staff. Willsie concluded the memo by saying that "a failure to respond within a reasonable period of time will be construed as an admission of guilt." (Willsie Depo. Ex. 10.)

Plaintiff took the letter to his attorney, John Reals, who in turn wrote to Willsie and advised him Wadud would be happy to respond as soon as he was provided with a copy of the policy. A copy of the private practice policy was thus provided to Reals, who wrote Willsie a letter dated February 17, 1986, denying that Wadud had ever treated a patient by the name of "Ware". Wadud was aware at that time that he had treated a patient by the name of "Donald Wear" and assumed that Wear was the patient Willsie was referring to; nevertheless, Wadud permitted his attorney to advise Willsie that Wadud had never treated a patient named "Ware".

Willsie terminated Wadud's employment with the county on February 18, 1986. At the time of his termination, Wadud received annual compensation and benefits of over $100,000.00.

Wadud subsequently filed the instant action, alleging the stated reasons for his discharge were pretextual and that he was terminated in retaliation for his exercise of first amendment rights. He further claims the circumstances of his termination deprived him of a property interest in his employment without procedural due process. Finally, plaintiff alleges pendent state claims of retaliatory discharge and breach of contract.

### Conclusions of Law

A. Procedural Due Process

Defendants initially assert that summary judgment is proper as to plaintiff's claim that he was denied due process because plaintiff has failed to allege any facts to support his claim that he had a property interest in his continued employment. Further, defendants argue that assuming plaintiff had a property interest in his employment, the pretermination procedures he received complied with due process as a matter of law.

The Fourteenth Amendment prohibits a state from depriving a person of

liberty or property without due process of law. A protected property interest in a particular benefit exists only if one has a legitimate claim of entitlement to it. *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). Property interests are created not by the Constitution, but arise from independent sources such as state statutes, local ordinances, established rules, or mutually explicit understandings. *Perry v. Sindermann,* 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972). Thus, the court must determine whether under Kansas law Wadud had a legitimate claim of entitlement to his continued employment. If so, he had a protected property interest and the court must consider whether the procedures utilized in terminating plaintiff's interest violated constitutional standards as a matter of law.

It is uncontroverted that Wadud did not have a written contract of employment. Wadud argues, however, that he had an "implied-in-fact" contract with the county. A property interest in employment can be created by such a contract. *Bishop v. Wood,* 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976).

Kansas has traditionally adhered to the doctrine of employment at will. Under this rule, in the absence of a contract between an employee and his employer covering the duration of employment, the employment is terminable at the will of either party. *Johnson v. National Beef Packing Co.,* 220 Kan. 52, 54–55, 551 P.2d 779 (1976); *Swart v. Huston,* 154 Kan. 182, 117 P.2d 576 (1941). The Kansas Supreme Court has recognized, however, that an exception to the at-will doctrine may exist where employees can show an implied contract of employment. *Morriss v. Coleman Co., Inc.,* 241 Kan. 501, 738 P.2d 841 (1987). Pursuant to *Morriss,* the question of whether an implied contract exists involves a factual inquiry, which generally would not be suitable for summary judgment.

In this case, plaintiff's implied contract theory is based upon three factors: the longevity of his employment; his 1977 promotion to director of the South Center; and his positive evaluations. While these are all factors which typically might be considered in evaluating the existence of an implied contract, the court finds as a matter of law that no implied contract exists in this case. The uncontroverted evidence indicates that plaintiff was a "classified exempt" employee, and that he understood this classification to mean that he was not entitled to the rights or privileges of "classified" employees under the county's personnel manual. Thus, plaintiff had no right, and understood that he had no right, to established termination procedures or grievance rights. Moreover, plaintiff conceded in his deposition that his employment was "indefinite".

This court has held on several occasions that the existence of a personnel manual containing established termination or grievance procedures **plus** additional factors supporting the existence of an implied contract creates a question of fact for the jury as to whether plaintiff had an implied contract. *See, e.g., Derstein v. Benson,* 714 F.Supp. 481 (D.Kan.1989); *Johnson v. City of Wichita,* 687 F.Supp. 1501, 1508 (D.Kan. 1988); *Derstein v. State of Kansas, et al.,* No. 84–1219–K, slip op. at 8, 1988 WL 66183 (D.Kan. Apr. 28, 1988). Such is not the case here, however, where the terms of plaintiff's employment were not governed by an employment manual. More importantly, in this case plaintiff concedes his employment was of an indefinite nature and he understood that he had no right to any termination or grievance procedures upon his termination. The uncontroverted facts therefore do not support plaintiff's assertion of the existence of an implied contract, and the general rule of employment at will controls this case.

Accordingly, the court finds as a matter of law that plaintiff had no implied contract and thus no property interest in his continued employment. Defendants are entitled to summary judgment on plaintiff's claim of denial of due process.

### B. First Amendment/Free Speech

Plaintiff next contends he was terminated for exercising protected rights under the

**1494**

First Amendment. Specifically, plaintiff alleges in his complaint that he was terminated as a result of "seeking to petition the governing board of the Sedgwick County Department of Mental Health concerning policies; reporting to the Sedgwick County Medical Society with professional concerns involving the Sedgwick County Department of Mental Health; and expressing to the Sedgwick County Department of Mental Health professional opinions as to the quality of care and service provided to the department."

It is well settled that "a State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick v. Myers*, 461 U.S. 138, 142, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708 (1983). The Tenth Circuit, in an exhaustive opinion, recently set out the framework for analyzing a claim by a public employee that his or her governmental employer made an adverse employment decision in violation of the employee's First Amendment rights. *Koch v. City of Hutchinson*, 847 F.2d 1436 (10th Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 262, 102 L.Ed.2d 250 (1988).

In *Koch*, the Tenth Circuit stated·that the threshold question is whether the employee's speech may be fairly characterized as constituting speech on a matter of public concern. The public concern inquiry turns on the content, form, and context of the speech in question, as revealed by the whole record. If a statement does touch on a matter of public concern, a court must then balance the interests of the employee in making the statement against the state's interest as an employer "in promoting the efficiency of the public services it performs through its employees." Id., at 1440 (quoting *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968)).

■ The question of whether an employee's speech is constitutionally protected is a question of law. If the court finds the speech is constitutionally protected, two further steps are required. The employee must prove that his protected speech was a motivating factor in the detrimental employment decision. The employer then bears the burden of showing by a preponderance of the evidence that it would have reached the same decision in the absence of the protected activity. These latter two steps involve factual questions. 847 F.2d at 1440 n. 11.

■ Thus, the court's first task is to determine whether Wadud's speech touched upon a matter of "public concern." If not, his speech was not constitutionally protected. In deciding this issue, the court will look at each alleged instance of protected speech, its content and form, as well as the context in which it was given.

The first instance of protected speech for which plaintiff alleges he was terminated involved the plaintiff's appearance before the governing board of the Department of Mental Health on December 5, 1985, shortly after the board's decision to prohibit private practice was announced. When Wadud first heard about the new rule approximately one month before the meeting, Wadud believed that the rule constituted a "breach of his contract." Moreover, he refused to accept the raise Willsie planned to recommend for psychiatrists, because the raise would not make up for the compensation he would lose as a result of losing his private practice.

When Wadud appeared before the board, his intent was to "let the board know [his] feelings about the private practice policy and the breach of the contract." (Pl.'s Depo., p. 86.) Wadud admitted in his deposition that his "basic concern" with the rule and "the position he presented before the governing board" regarding the private practice rule was that the rule constituted a breach of his contract. (Pl.'s Depo., p. 86.)

Defendants argue, based upon plaintiff's own admissions, that Wadud's speech was not related to a matter of public concern, but rather, involved an employee speaking out upon "matters only of personal interest." *Connick v. Myers*, 461 U.S. at 147, 103 S.Ct. at 1690. In particular, defendants suggest that plaintiff's speech was motivated solely by his own financial and career interests.

Plaintiff suggests that the fact that he had a financial interest in the subject of his speech does not necessarily mean the speech was not protected. He points out that it is not unusual for courts to find that speech which involves personal financial interests may also be of public concern. *See, e.g., Knapp v. Whitaker,* 757 F.2d 827 (7th Cir.), *cert. denied,* 474 U.S. 803, 106 S.Ct. 36, 88 L.Ed.2d 29 (1985) (teacher's communications with school board concerning inequitable mileage allowance for coaches was an attempt to inform the public and educational policymakers of inequitable administration of funds); *McKinley v. City of Eloy,* 705 F.2d 1110 (9th Cir.1983) (police officer's complaints to city council regarding rate of compensation for city police related to city's ability to attract and retain qualified personnel, a matter of public concern).

The Supreme Court has broadly defined matters of "public concern" as communication "relating to any matter of political, social or other concern to the community." *Connick v. Myers,* 461 U.S. at 146, 103 S.Ct. at 1689. The Tenth Circuit recently noted that the motivation of the speaker is one aspect which courts consider in determining this issue—i.e., was the point of the speech in question to bring wrongdoing to light or to raise issues of public concern, or was it to further some purely private interest. *Koch v. City of Hutchinson,* 847 F.2d at 1446. *See also Melton v. City of Oklahoma City,* 879 F.2d 706 (10th Cir.1989).

In the instant case, the record demonstrates that plaintiff's comments to the board were motivated by his concern that under the new rule he would no longer be permitted to make substantial additional income or expand his client base through the operation of his private practice. Plaintiff perceived the rule prohibiting private practice as a "breach" of his employment "contract". Under the circumstances presented here, the court finds that plaintiff's speech does not touch upon a matter of public concern; rather, it undoubtedly involves an employee speaking out upon "matters only of personal interest."

While plaintiff attempts to argue that the prohibition against private practice will cause higher staff turnover and raise "quality of care" issues, this "concern" was not his primary contention before the board, nor his motivation in speaking to the board.

The uncontroverted facts simply do not support plaintiff's contention that his speech to the board regarding the mental health center's prohibition against private practice was related to any matter of political, social or other concern to the community, and the court finds as a matter of law that plaintiff's speech to the governing board was not protected.

Plaintiff next argues that his comments to Dr. Skibba of the Mental Health Society regarding the private practice rule and the "standard of care" at the department constituted speech on a matter of public concern. The minutes of the society's board of directors verify that plaintiff had previously expressed his concern to Skibba about both of these topics and that the issues were then discussed by Dr. Skibba at the board meeting.

The minutes of the board meeting clearly reflect the nature of Wadud's complaints about the private practice rule. Specifically, the minutes show that the society's board of directors concluded that the mental health center's prohibition against private practice was an "internal matter" which the medical society should not become involved in.

Further, plaintiff's complaints to Dr. Skibba concerning the "standard of care" at the mental health center do not involve "matters of public concern." The plaintiff did not detail in his deposition the nature of his complaints to Dr. Skibba concerning the quality of care at the center. Nor do the minutes of the society reflect any specifics of plaintiff's claim, as discussed by Dr. Skibba.

The Tenth Circuit has noted that in order for a public employee's speech to be "of public concern," it is not always enough that " 'its **subject matter** could in [certain] circumstances, [be] the topic of a communication to the public that might be of gener-

al interest.' What is actually said on that topic must itself be of public concern." *Wilson v. City of Littleton, Colorado,* 732 F.2d 765, 769 (10th Cir.1984) (quoting *Connick v. Myers,* 103 S.Ct. at 1691). While there is little doubt that statements concerning the "standard of care" at a mental health center could, in certain circumstances, be a matter of public concern, there is no evidence here that plaintiff made any statements to Dr. Skibba which were **actually** of public concern. Rather, the evidence indicates that Wadud complained only generally of the "low standard of care" at the center.

■ Moreover, even if the court were to find that Wadud's statements to Dr. Skibba could be characterized as "matters of public concern," the court would be required to find that while protected, this speech could not have been a basis for plaintiff's termination. Plaintiff himself provided the court with a letter dated January 3, 1986 from defendant Willsie to the county counselor in which Willsie asks the county's attorney to approve a proposed memorandum to Wadud. The memorandum is basically the same memorandum sent to Wadud on January 23, 1986, which details an alleged violation of the private practice rule by Wadud and makes it clear that Wadud will be terminated if he is unable to explain the apparent violation.

Thus, it is clear that the basis for plaintiff's termination was decided as early as January 3, 1986—before plaintiff spoke with Dr. Skibba about his concerns regarding the private practice rule and the standard of care at the center. Accordingly, although the question of causation is usually a fact question, the court finds as a matter of law that plaintiff's comments to Dr. Skibba of the medical society played no role in his subsequent termination.

■ Lastly, plaintiff asserts that he was terminated because of miscellaneous conversations he had with Willsie, Dr. Jehan, and a number of other professionals in the department over a period of years.

Although plaintiff's complaint does not provide any details regarding this allegation, plaintiff, in his deposition, indicated

that he discussed standard of care issues and the rule prohibiting private practice with a number of professionals in the department other than Dr. Jehan and defendant Willsie. He is apparently suggesting that these conversations constituted protected speech. For the same reasons discussed above, the court finds that plaintiff's speech concerning the private practice rule did not involve a matter of public concern, and the fact that numerous other individuals in the department were also interested in the topic does not make it a matter of public concern. *See, e.g., Gomez v. Texas Dept. of Mental Health,* 794 F.2d 1018, 1021 (5th Cir.1986). Moreover, the uncontroverted evidence indicates that these conversations could not have resulted in plaintiff's termination because defendant Willsie was unaware of them when he terminated plaintiff's employment.

Plaintiff also appears to be suggesting that various conversations he had with Dr. Jehan and defendant Willsie over a period of years concerning administrative as well as medical matters constituted protected speech. These conversations pertained to a range of topics, including whether oxygen tanks should be kept in the mental health facilities, whether physical restraints should be used on patients, whether staff psychiatrists should be permitted to retain monies earned in teaching, and under what circumstances patients could be involuntarily admitted to the hospital.

The court finds that these discussions did not involve matters of public concern, but rather, were clearly reflective of personal and philosophical differences between plaintiff, Willsie and Jehan concerning the operation of the mental health center.

The court concludes that the uncontroverted facts demonstrate that plaintiff did not have a protected property interest in his employment and was thus not entitled to procedural due process upon his termination. Further, plaintiff's speech concerning the department's prohibition against private practice did not involve a matter of public concern and was therefore not constitutionally protected speech. Finally, because plaintiff's § 1983 claims must be dis-

missed as a matter of law, the court declines to exercise pendent jurisdiction over plaintiff's state law claims of breach of contract and retaliatory discharge. *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). Defendants' motion for summary judgment must therefore be granted.

IT IS ACCORDINGLY ORDERED, this 31 day of July, 1989, that defendants' motion for summary judgment is granted.