822 F.2d 364
 Ronald MORTON
v.
Howard L. BEYER, in his capacity as Administrator of Trenton
State Prison, and New Jersey Department of Corrections.
Appeal of Howard BEYER, William Fauver and New Jersey
Department of Corrections, Appellants.
 No. 86-5499.
 United States Court of Appeals,
Third Circuit.
 Argued Feb. 10, 1987.
Decided June 24, 1987.
As Amended July 2, 1987.
 
 Lewis A. Scheindlin (argued), Deputy Atty. Gen., Trenton, N.J., for appellants.
 Robert B. Reed (argued), Reed, Strauss and Tauriello, Flemington, N.J., for appellee.
 Before HIGGINBOTHAM and STAPLETON, Circuit Judges, and CONABOY, District Judge.*
 OPINION OF THE COURT
 A. LEON HIGGINBOTHAM, Jr., Circuit Judge.
 
 
 1
 This appeal arises from the order of the district court granting plaintiff-appellee Ronald Morton's application for a preliminary injunction seeking reinstatement and back pay or, alternatively, back pay and suspension with pay pending a final post-termination hearing. Based primarily on its determination that Morton was afforded a procedurally deficient pretermination hearing in contravention of Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), the district court granted appellee's motion, awarded him back pay and ordered defendants-appellants to return Morton to active employment at the Department of Corrections or to continue his suspension with pay. For the reasons set forth below, we find that the requirements for injunctive relief were not met. Accordingly, we will reverse the order of the district court.
 
 I.
 
 2
 On June 19, 1986, appellee Morton filed a complaint pursuant to 42 U.S.C. Sec. 1983 (1982), against Howard Beyer, Administrator of the New Jersey State Prison, William Fauver, Commissioner of the New Jersey Department of Corrections, John Doe, and the New Jersey Department of Corrections, alleging that appellants violated and conspired to violate his rights guaranteed by the due process and equal protection clauses of the fourteenth amendment. Prior to the institution of this action, Morton was actively employed by the New Jersey Department of Corrections as a corrections sergeant at Trenton State Prison. As a corrections sergeant, Morton was responsible for the care and custody of prison inmates as well as the supervision of fellow corrections officers. The instant action arose from Morton's suspension without pay on the ground that he had physically abused an inmate without cause and had attempted to cover-up his involvement in the incident.
 
 
 3
 Morton's suspension stemmed from a complaint filed on September 25, 1985, by an inmate named Olsen charging that Morton and two other corrections officers entered his cell and assaulted him with a baton. On the day of the alleged assault, Morton was interviewed by an investigator from the prison's Office of Internal Affairs. After being advised of his Miranda rights, Morton issued a written statement concerning his encounter with inmate Olsen in which he maintained that "at no time was [Olsen] harmed or injured by me or any staff member." Appendix ("App.") at 15a. An investigation of the incident ensued and was substantially complete by October 26, 1985. The decision to take disciplinary action against Morton was not made, however, until on or around March 26, 1986. See App. at 158a. On that date, as he arrived for his scheduled shift, Morton was approached by a fellow corrections officer who handed him an envelope from appellant Beyer. The envelope contained a brief memorandum, the text of which read: "This is to advise you that you are suspended from duty effective immediately. You are hereby ordered to report to my office on Thursday, March 27, 1986, at 9 a.m. sharp." See App. at 159a.
 
 
 4
 On the morning of March 27, Morton arrived at Beyer's office accompanied by his union representative, John Adams. Beyer advised Morton that he anticipated bringing charges against him for the September 26, 1985 incident. Beyer further indicated that the meeting was intended to provide Morton with a hearing. Beyer supplied Morton with a packet of materials, consisting of the various investigative reports of the incident, for his review and comment. Upon the advice of his union representative, Morton categorically denied any wrongdoing but declined to offer his version of the incident. Beyer then informed Morton that he was suspended without pay. Adams objected to the suspension, arguing that under Loudermill any suspension should be with pay. See App. at 126a. After a brief recess, during which Beyer discussed Morton's case with Assistant Superintendent Anthony Turner, Beyer again informed Morton that he was suspended without pay pending the outcome of the investigation. According to Morton, the meeting--including the recess--lasted approximately ten minutes. App. at 115a.
 
 
 5
 A written report summarizing the meeting, entitled "LOUDERMILL HEARING, Ronald Morton, Correctional Sergeant," was prepared and given to Morton at the close of the meeting. App. at 154a-156a; see also App. at 98a (text of the written report). In addition, a memorandum from Beyer dated March 27, 1986, further advised Morton that his "conduct on September 26, 1985 was unbecoming [of] an employee in public office." App. at 97a. Specifically, the memorandum informed Morton that "the [pending] investigation reveals that you physically abused an inmate without cause and were involved in a conspiracy to cover-up your involvement." Id. Finally, on April 9, 1986, the Trenton State Prison served Morton with a Preliminary Notice of Disciplinary Action which specifically summarized the allegations leveled against Morton, including names and dates.
 
 
 6
 Pursuant to N.J.Admin.Code. tit. 4, Sec. 1-5.1(a) (Supp.1986),[1] Morton requested a departmental hearing on the charges and the hearing was scheduled for June 30, 1986.[2] Prior to that hearing, on June 27, 1986, Morton filed his Sec. 1983 complaint and order to show cause before the district court. On July 9, 1986, after two days of argument, the district court issued the preliminary injunction that is the subject of this appeal.
 
 II.
 
 7
 "We have consistently held that our review of the grant or denial of preliminary injunctions is limited to determining whether there has been an abuse of discretion, an error of law, or a clear mistake in the consideration of the proof." Moteles v. University of Pennsylvania, 730 F.2d 913, 918 (3d Cir.1984); see e.g., Sullivan v. City of Pittsburgh, 811 F.2d 171, 181 (3d Cir.1987); Rennie v. Klein, 653 F.2d 836, 840-41 (3d Cir.1981); A.O. Smith Corp. v. F.T.C., 530 F.2d 515, 525 (3d Cir.1976). To obtain a preliminary injunction, the moving party must demonstrate both a likelihood of success on the merits and the probability of irreparable harm if relief is not granted.[3] See Freixenet, S.A. v. Admiral Wine & Liquor Co., 731 F.2d 148, 151 (3d Cir.1984). As this Court noted in In Re Arthur Treacher's Franchisee Litig., 689 F.2d 1137 (3d Cir.1982), "we cannot sustain a preliminary injunction ordered by the district court where either or both of these prerequisites are absent." Id. at 1143. Accordingly, we turn to the district court's determinations concerning these prerequisites to ascertain whether the preliminary injunction was properly issued.
 
 A. Likelihood of Success on the Merits
 
 8
 In Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), the Supreme Court held that, prior to termination, a public employee with a property interest in continued employment[4] must be afforded "a pretermination opportunity to respond, coupled with post-termination administrative [or judicial] procedures." Id. at 547-48, 105 S.Ct. at 1496. "[T]he pretermination 'hearing', though necessary, need not be elaborate." Id. at 545, 105 S.Ct. at 1495. Nor must it "definitively resolve the propriety of the discharge. It should be an initial check against mistaken decisions--essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." Id. at 545-46, 105 S.Ct. at 1495. To ensure that the pretermination hearing is a meaningful one, the employee "is entitled to oral or written notice of the charges against him [or her], an explanation of the employer's evidence, and an opportunity to present his [or her] side of the story." Id. at 546, 105 S.Ct. at 1495. Finally, the availability of extensive post-termination procedures does not eliminate the essential requirement of due process that a hearing be provided before discharge. Id. at 545, 105 S.Ct. at 1495, see also Gniotek v. City of Philadelphia, 808 F.2d 241, 243 (3d Cir.1986) ("The predeprivation hearing ... is necessary, even if extensive post-deprivation remedies are afforded."); cf. Loudermill, 470 U.S. at 547 n. 12, 105 S.Ct. at 1496 n. 12 ("[T]he existence of post-termination procedures is relevant to the necessary scope of pretermination procedures.").
 
 
 9
 After hearing testimony from the four individuals who were present at Morton's March 27 "Loudermill " hearing--Beyer, Assistant Superintendent Turner, union representative Adams, and Morton--the district court issued an oral opinion that the pretermination hearing did not meet the requirements of Loudermill. In making its determination, the district court held that Loudermill requires "meaningful notice" of the charges brought against the employee, App. at 183a, and concluded that such notice was not provided in this case where Morton was not advised prior to the commencement of the hearing of the specific charges being brought against him or that a Loudermill hearing was being held to explore these charges. Id. The district court further held that Loudermill requires notice to the employee of the adverse evidence that will be presented at the hearing "so that the employee has the opportunity to meet that evidence, or to marshal other evidence which he believes the hearing officer should be in possession of...." Id. Moreover, the district court indicated that notice is inadequate where an employee is deprived of an opportunity to obtain a lawyer, if he desires, instead of a union representative, to attend the hearing. Id. at 184a. The district court expressly noted its recognition that the hearing need not be a "full-blown trial ... but [declared that] it must have more than superficial adherence to the rituals and requirements of Loudermill." Id. Finally, the court concluded that the "hearing [Morton received] ... was in no way commen[su]rate with the gravity of the sanction" to be imposed upon him, and thus contravened the command of Loudermill. Id.
 
 
 10
 Appellants argue that the district court's interpretation of Loudermill constitutes an impermissible expansion of the procedural due process safeguards set forth by the Supreme Court. Under the district court's view, appellants maintain, an employer would be required to afford an employee "the type of formal procedure that should be part of the post-termination process but is not required before discharge." Brief on Behalf of Defendants-Appellants at 23. Appellants contend that Loudermill, properly construed, was complied with on the facts of this case. In particular, appellants argue that the Loudermill Court "clearly indicated that due process does not require notice to the employee prior to the commencement of the hearing...." Id. at 23. Moreover, appellants assert that this Court's recent decision in Gniotek v. City of Philadelphia, 808 F.2d 241 (3d Cir.1986), similarly held that advance notice is not required under Loudermill. See Letter of Cary W. Edwards, Attorney General of New Jersey, by Lewis A. Scheindlin, Deputy Attorney General (Jan. 23, 1987). Appellants thus conclude that the notice provided to Morton at the commencement of the meeting on March 27 was consistent with Loudermill and the law of this Circuit.[5]
 
 
 11
 Although the sequence of events is not crystal clear, the record reflects that shortly after the commencement of the meeting, Beyer advised Morton that disciplinary action was being considered in connection with Morton's alleged involvement in an incident of inmate abuse on September 26, 1985. There is no evidence that Beyer indicated who the inmate was or otherwise informed Morton of the specific events alleged to have transpired on the referenced date. Beyer did, however, provide Morton with copies of the investigative reports surrounding the incident and gave him an opportunity to respond. Upon advice from Adams, Morton declined comment beyond a general denial of any wrongdoing. Appellants emphasize Morton's testimony that, although no limitation was imposed on the time he had to examine the documents, he only "leafed through" the materials and acquired "some idea of what it was about." App. at 109a. In sum, appellants insist that Morton had both notice of the charges against him and the opportunity to present his side of the story to demonstrate to Administrator Beyer that reasonable grounds did not exist to support the charges against him. Appellants urge this Court not to allow Morton's silence to obscure the adequacy of the opportunity provided to him. Before reaching the issue of Morton's opportunity to respond, however, we must first determine what constitutes sufficient notice under Loudermill and whether Morton was afforded such notice under the circumstances of this case.
 
 
 12
 In Goss v. Lopez, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), the Supreme Court considered the due process rights of public school students targeted for suspension. In concluding that the students were entitled to notice of the accusations against them and an opportunity to respond to those accusations, the Court observed that "[t]here need be no delay between the time 'notice' is given and the time of the hearing." Id. at 582, 95 S.Ct. at 740. Appellants point to the Loudermill Court's reliance on Goss as evidence of the Court's continued adherence to the view that advance notice is not a per se requirement of due process. We agree. See also Gniotek, 808 F.2d at 244 ("Lack of advance notice ... does not constitute a per se violation of due process."). We do not agree, however, that that reliance is "particularly instructive in the present case." Brief on Behalf of Defendants-Appellants at 25. Indeed, the fact that "there need be no delay" does not undercut the district court's determination that, in this case, advance notice was required to meet the demands of due process. As this Court observed in Gniotek, "[n]otice is sufficient, 1) if it apprises the vulnerable party of the nature of the charges and general evidence against him [or her], and 2) if it is timely under the particular circumstances of the case." 808 F.2d at 244. Thus, although "advance notice is not required[,'t]he timing and content of notice ... will depend on appropriate accomodation of the competing interests involved.' " Id. (quoting Goss, 419 U.S. at 579, 95 S.Ct. at 738).
 
 
 13
 Here, the issue of the sufficiency of the notice is intertwined with the timeliness inquiry. Approximately six months had elapsed between the time of the alleged incident and Morton's suspension. The initial memorandum served upon Morton on March 26 offered no explanation for his suspension from duty. Although Morton testified that he was aware that an internal affairs investigation was initiated within a couple of days of the alleged incident between himself and Olsen, there is no indication that he had reason to know that the investigation was ongoing some six months later.[6] Nor was Beyer's vague reference on the morning of the hearing to a date and a general allegation of inmate abuse sufficient to provide Morton with effective notice of the particular incident or the specific charges to which he should respond.
 
 
 14
 Appellants seem to suggest, however, that Beyer's provision of copies of the investigative reports to Morton remedies any defect in the notice. In that regard, appellants assert that Morton was given a full opportunity to review the evidence, that no limitation was placed on the time he had to examine the documents, that Morton did not request additional time to review the evidence, that he rejected his opportunity to respond, and that therefore he should not be heard to complain about the adequacy of his hearing.[7] We disagree. Interpreting the due process requirements articulated in Loudermill and Arnett v. Kennedy,[8] 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), the Supreme Court recently observed that "the constitutional requirement of a meaningful opportunity to respond before a temporary deprivation may take effect entails, at a minimum, the right to be informed not only of the charges but also of the substance of the supporting evidence." Brock v. Roadway Express, Inc., --- U.S. ----, 107 S.Ct. 1740, 1749, 95 L.Ed.2d 239 (1987). The Court proceeded to note, however, that the opportunity to respond must be afforded 'at a meaningful time and in a meaningful manner.' Id. 107 S.Ct. at 1749 (quoting Armstrong v. Manzo, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965)). Appellants reliance on Gniotek for the proposition that Morton may not be shielded by his own silence where he was provided a full opportunity to respond is thus misplaced.[9]
 
 
 15
 Gniotek is distinguishable from the instant action. In Gniotek, several police officers were identified in federal court testimony as the recipients of bribes. The following day, each officer was summoned to the commanding officer's office and informed of both the testimony and the criminal investigations that had been initiated against them. The officers were given Miranda warnings and asked whether they wished to make a statement. Upon advice of counsel, each declined comment. We held that adequate notice was provided to the officers notwithstanding their choice to remain silent. See 808 F.2d at 244-45. Here, Morton stated that he refused to respond "because [h]e didn't know exactly what this thing was about and the ramifications that it was going to have." App. at 109a. Similarly, union representative Adams testified: "I advised Morton not to make any statement unless Mr. Beyer would guarantee that what he said wouldn't be used against him because we didn't have time to read anything, we didn't even know why we were up there until he put th[e documents] in front of us." Id. at 133a. Unlike the officers in Gniotek, we read Morton's silence as primarily rooted in the lack of notice of the charges against him as opposed to fear of the potential consequences of his statements. We conclude that presentation of adverse evidence within minutes of ineffective notice simply does not comport with the due process requirements set forth in Loudermill. In other words, for the informal discussion contemplated by Loudermill to be meaningful, the employee must be apprised of the nature of the charges against him or her before or at the time the hearing begins;[10] subsequent presentation of evidence underlying the charges of which the employee is not adequately informed does not satisfy the demands of due process. On the undisputed facts of this case, Morton was not afforded timely notice of the nature of the charges or the general evidence against him. Accordingly, the district court did not err in concluding that Morton had demonstrated a likelihood of success on the merits of his claim.[11]
 
 B. Irreparable Harm
 
 16
 The district court's order granting appellee's motion for injunctive relief must nonetheless be reversed. Although Morton sustained his burden of demonstrating a likelihood of success on the merits, he failed to establish that irreparable injury would result if relief were denied. "[A] failure to show a likelihood of success or a failure to demonstrate irreparable injury must necessarily result in the denial of a preliminary injunction." In Re Arthur Treacher's Franchisee Litigation, 689 F.2d at 1143.
 
 
 17
 During the hearing on Morton's application for preliminary injunction, Morton testified as follows:
 
 
 18
 Well, I have myself, I have two sons, my older son is in, goes down to the University of Virginia. I have car payment, mortgage, insurance, you know, everything that most people have, in the course of a day. I have charges at Bamberger's and Penney's, different stores.
 
 
 19
 I have a loan, two loans, I have one at the Capitol Bank, one with the Chase Manhattan for my son. I guess in the everyday, you know, the everyday expenses that everybody has, food, utilities.
 
 
 20
 App. at 112a. Based on this testimony, the district court found "that there is unquestionably irreparable harm present in this case." Id. at 184a. The court reasoned that "for someone who lives, in effect, on his salary," deprivation of that salary would be "economically irreparable and c[ould] not be cured by giving the money back at a subsequent date."[12] Id. at 185a.
 
 
 21
 The claimed injury testified to by Morton is purely economic in nature and thus compensable in money. This Court has recognized that "the fact that the payment of monies is involved does not automatically preclude a finding of irreparable injury," United Steelworkers of Am. v. Fort Pitt Steel Casting, 598 F.2d 1273, 1280 (3d Cir.1979); we have emphasized, however, that " 'the injury must be of a peculiar nature, so that compensation in money cannot atone for it.' " A.O. Smith Corp., 530 F.2d at 525 (citations omitted). Although we are not insensitive to the financial distress suffered by employees whose wages have been terminated, we do not believe that loss of income alone constitutes irreparable harm. Indeed, the Supreme Court has observed that
 
 
 22
 an insufficiency of savings or difficulties in immediately obtaining other employment--external factors common to most discharged employees and not attributable to any unusual actions relating to the discharge itself--will not support a finding of irreparable injury, however severely they may affect a particular individual.
 
 
 23
 Sampson v. Murray, 415 U.S. 61, 92 n. 68, 94 S.Ct. 937, 953 n. 68, 39 L.Ed.2d 166 (1974). See also Holt v. Continental Group, Inc., 708 F.2d 87, 90 (2d Cir.1983) ("the requisite irreparable harm is not established in employee discharge cases by financial distress or inability to find other employment, unless truly extraordinary circumstances are shown").
 
 
 24
 Morton's testimony simply does not establish the type of injury necessary to invoke the injunctive power of the federal courts for interim relief. Nor has Morton argued before this Court the existence of any extraordinary circumstances or otherwise presented support for the district court's finding of irreparable harm.[13] Indeed, the case law of this Circuit weighs heavily against sustaining a finding of irreparable injury. See, e.g., Moteles, 730 F.2d at 919 (injury from involuntary transfer no more than an "inconvenience easily compensable by damages"); Oburn v. Shapp, 521 F.2d 142, 151 (3d Cir.1975) (loss of benefits derived from state employment not irreparable injury). In sum, then, Morton has failed to allege facts which, if true, could not be adequately remedied by money damages.[14] For this reason, the district court's order granting interim injunctive relief cannot stand. Accordingly, we will reverse.
 
 
 
 *
 Honorable Richard P. Conaboy, United States District Judge for the Middle District of Pennsylvania, sitting by designation
 
 
 [1]
 N.J.Admin.Code. tit. 4, Sec. 1-5.1(a) (Supp.1986) provides that employees served with a Preliminary Notice of Disciplinary Action "may request a departmental hearing within 10 days of receipt of the Notice." Id. at Sec. 1-5.1(a)(1). "[S]uch hearing shall be held within 30 days of the request unless adjourned by consent of the parties or stayed pending a criminal complaint or indictment...." Id. at Sec. 1-5.1(a)(3)
 
 
 [2]
 Although not a part of the record on appeal, this Court has been advised that the departmental hearing was held as scheduled and that, at the conclusion of the hearing, the hearing officer sustained the charges and Morton was discharged. Morton has appealed for de novo review of this decision to the Civil Service Commission. See Brief on Behalf of Defendants-Appellants at 8 n. *
 
 
 [3]
 In addition to the two above noted preconditions, "the district court 'should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.' " Oburn v. Shapp, 521 F.2d 142, 147 (3d Cir.1975) (citations omitted)
 
 
 [4]
 It is undisputed that Morton is a public employee and that he has a constitutionally protected property interest in his continued employment
 
 
 [5]
 Appellee Morton repeatedly suggests that the focal point of our inquiry into whether a Loudermill violation occurred must be on his suspension on the evening of March 26, 1987. See Brief on Behalf of Plaintiff-Appellee at 6-7, 8-9, 11. In this regard, Morton argues, in effect, that under Loudermill, he was entitled to "some kind of a hearing" prior to the March 26 suspension. Morton maintains that "the record shows that [he instead] was suspended prior to any hearing and before receiving any notice of the charges against him." Id. at 7. Morton concludes that the March 27 meeting in Beyer's office "was not a 'hearing' at all, but rather a transparent attempt by [Beyer] to satisfy ... the requirements of Loudermill." Id. at 8
 The record does not bear out Morton's contention. In Loudermill, the Supreme Court expressly recognized a governmental interest in the prompt removal of unsatisfactory employees. See 470 U.S. at 543, 105 S.Ct. at 1494. Although it concluded that this government interest does not outweigh the interests protected by provision of pretermination hearings, the Court did note that "in those situations where the employer perceives a significant hazard in keeping the employee on the job, it can avoid the problem by suspending with pay." Id. at 545, 105 S.Ct. at 1495. The text of the memorandum given to Morton on March 26 (as read into the record by Administrator Beyer), see App. at 159a, and Morton's own testimony, see id. at 107a, indicate that his suspension on March 26 was only from duty. Rather than run afoul of Loudermill by relieving Morton from duty, Beyer actually took action that was specifically contemplated by the Court. See also App. at 117a (Morton's testimony conceding that Beyer informed him that his continued presence might represent either a danger to himself or the inmates and thus threatened the security of the institution). At that juncture, Morton was not constitutionally entitled to any kind of hearing. Thus, the proper focus for the purpose of determining whether Loudermill 's requirements were satisfied is the March 27 meeting in Administrator Beyer's office, which resulted in the termination of Morton's wages.
 
 
 [6]
 In addition, Morton testified that in January 1986, he was transferred from his regular first shift assignment to the third shift. At that time, according to Morton, Beyer advised him that the shift change was necessary "because of the different incidents that [Morton] had been involved in." App. at 105a. Morton further testified that Beyer warned him that "because of the things you have been involved in, sooner or later the hammer is going to fall...." Id. Beyer did not specify, however, that the allegations made by Olsen constituted the primary basis for either the shift change or his apparent prediction that Morton would face reprisals--whether official or unofficial--sometime in the future. Id. at 106a. Thus, we cannot conclude with confidence that Morton was on notice that the Olsen incident underlay his March 26 suspension or the scheduling of the March 27 meeting
 
 
 [7]
 The cases appellants cite in support of their argument that Morton was provided an adequate Loudermill hearing are inapposite on these facts. See Riggins v. Board of Regents, Univ. of Nebraska, 790 F.2d 707 (8th Cir.1986); Buschi v. Kirven, 775 F.2d 1240 (4th Cir.1985); Kelly v. Smith, 764 F.2d 1412 (11th Cir.1985); Brasslett v. Cota, 761 F.2d 827 (1st Cir.1985). In these cases, notice of the charges against the employees was provided contemporaneously with the incident(s) underlying the challenged disciplinary action. Consequently, the plaintiffs in those cases did not maintain that ineffective notice rendered meaningless their opportunity to respond
 
 
 [8]
 Arnett involved a challenge by a former federal employee to the procedures by which he was dismissed. Although those procedures did not provide for a full evidentiary hearing prior to discharge, the majority of the Supreme Court found that those procedures satisfied the constitutional minima where the employee was afforded advance notice of the reasons for the discharge, an opportunity to respond orally and in writing, and an adequate post-termination hearing
 
 
 [9]
 In Gniotek, we rejected the appellants's arguments that (1) because their responses in the pretermination hearing could have been used against them in a later criminal action, they were deprived of a meaningful opportunity to respond, and (2) that their privilege against self-incrimination was unconstitutionally burdened because they were forced to choose between asserting the privilege and responding to the charges against them
 
 
 [10]
 This is not to say, of course, that simultaneous notice of the nature of the charges and the substance of the supporting evidence will never satisfy the demands of due process. To the contrary, simultaneous notice, under the appropriate circumstances, may well be all that is constitutionally required. Where, as here, however, the initial notice of the nature of the charges is itself ineffective, the employer's responsibility to inform the employee of the basis for the proposed disciplinary action may not be shifted to the employee by supplying him with a bulk of materials to determine for himself the nature of the charges against him. Morton was not specifically apprised of the nature of the charges against him. Placing the burden on Morton of determining the reason for the March 27 meeting and the basis for the proposed disciplinary action against him is inconsistent with Loudermill
 
 
 [11]
 In affirming the conclusion of the district court that Morton likely received an inadequate Loudermill hearing, we emphasize that we simply hold that, on the facts of this case, prior notice of the nature of the charges against Morton was required. Particularly in light of the significant lapse in time between the alleged improper conduct and the hearing in Beyer's office, Morton should have been provided sufficient time, at the very least, to recount the facts in his own mind and thus to prepare himself to demonstrate to Beyer that reasonable grounds to believe that the charges were true did not exist. Whether, as the district court intimated, advance notice was required to enable Morton to ensure the attendance of a lawyer if he so desired would depend on Morton's right to have an attorney present at the hearing. That determination involves independent legal inquiries that are not raised in this appeal
 
 
 [12]
 The district court also noted its concern that "it would be some time before this entire matter was disposed of down the road somewhere, when [Morton] would be afforded an opportunity to receive his back pay...." App. at 185a
 
 
 [13]
 On appeal, Morton argues that irreparable harm is established by the damage to his name and reputation as a corrections officer as a result of his illegal suspension. In support of this contention, Morton cites this Court's opinion in Fitzgerald v. Mountain Laurel Racing, Inc., 607 F.2d 589 (3d Cir.1979). In Fitzgerald, we found irreparable injury to the business and reputation of a licensed harness racing trainer and driver as a result of his eviction from the Meadows Race Track. 607 F.2d at 601. Morton argues that his suspension similarly constitutes irreparable harm because "the trust and confidence that he had earned from the prisoners and fellow employees" has been so impaired that he is precluded from obtaining employment in his chosen profession. See Brief on Behalf of Plaintiff-Appellee at 14. Our determination in Fitzgerald, however, was based on the nature of appellant's profession. Quoting the Supreme Court, we recognized that '[o]nce licenses are issued.... their continued possession may become essential in the pursuit of livelihood.' 607 F.2d at 601 (quoting Bell v. Burson, 402 U.S. 535, 539, 91 S.Ct. 1586, 1589, 29 L.Ed.2d 90 (1971))
 Although "trust and confidence" may be important, even determinative, factors in Morton's pursuit for employment as a corrections officer, we do not equate the erosion of those factors as the result of a suspension with the suspension of a license. In other words, the licensee in Fitzgerald was potentially barred, not merely impaired, from obtaining employment. See id. at 598 ("expelling Fitzgerald from the stall space had the extreme effect of barring him from any activity at the track"). No such extreme deprivation is present here.
 
 
 [14]
 We note here parenthetically our concern with the implications of this case on the enforcement of Loudermill. In Loudermill, Justice Marshall was troubled that
 it is in no respect certain that a prompt post-deprivation hearing will make the employee economically whole again, and the wrongfully discharged employee will almost inevitably suffer irreparable injury. Even if reinstatement is forthcoming, the same may not be true of back pay ... and the delay in receipt of wages would thereby be transformed into a permanent deprivation. Of perhaps equal concern, the personal trauma experienced during the long months in which the employee awaits decision, during which he suffers doubt, humiliation and the loss of an opportunity to perform work, will never be recompensed, and indeed probably could not be with dollars alone.
 470 U.S. at 549, 105 S.Ct. at 1497 (Marshall, J., concurring in part). Although we have held that the injuries contemplated by Justice Marshall ordinarily will not warrant injunctive relief, we recognize that those injuries are nevertheless very real and should not be inflicted with impunity. Moreover, we recognize that such injuries may accompany both the wrongfully discharged employee and the employee whose discharge is ultimately upheld. Loudermill, however, imposes minimal constitutional requirements on employers; compliance with those requirements is not contingent upon a prediction of the likelihood of success on the employee's wrongful discharge claim. In other words, procedural due process guarantees extend to all covered employees, whether or not their discharges are ultimately upheld. In this appeal, because the finality of Morton's discharge has not yet been determined, we do not address the issue whether sanctions or an alternative remedy is available and appropriate where the employer openly flouts or makes minimal efforts to comply with the dictates of Loudermill.