# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Charles Kern                          :
                                      :
              v.                      :   No. 1877 C.D. 2017
                                      :   Submitted:  August 10, 2018
Green Tree Borough and Green Tree     :
Borough Civil Service Commission,     :
                    Appellants        :


BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge
           HONORABLE RENÉE COHN JUBELIRER, Judge
           HONORABLE ELLEN CEISLER, Judge


**OPINION NOT REPORTED**


MEMORANDUM OPINION BY
JUDGE COHN JUBELIRER[1]                    FILED: January 31, 2019


Green Tree Borough (Borough) and the Green Tree Borough Civil Service Commission (Commission) appeal the December 7, 2017 Order of the Court of Common Pleas of Allegheny County (common pleas), which granted the statutory appeal of Charles Kern, a Borough police officer (Officer).[2]  Officer had been suspended by Borough Council for one day after sending an e-mail to Borough Police Department employees, which the Chief of the Borough Police Department (Police Chief) considered unprofessional and insubordinate.  Officer appealed to the Commission, which denied his appeal and sustained the suspension.  Upon further appeal, common pleas reversed the Commission's Decision and ordered that the

---

[1] This case was reassigned to the author on October 23, 2018.
[2] Although the Commission is a named appellant, it has declined to file a brief.

charges against Officer be withdrawn, his lost wages returned to him, and references to the incident removed from his personnel files. In doing so, common pleas found that Officer's meeting with Police Chief prior to the imposition of the suspension did not satisfy the due process requirements for a pre-disciplinary conference (PDC) established in *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985). For the reasons that follow, we reverse.

## I. Factual and Procedural Background

### A. Assignment of Officer to Position of Business Liaison Officer

The facts are largely undisputed. On January 20, 2017, Police Chief assigned Officer to work as the Business Liaison Officer. This assignment required Officer to collect information from local businesses, including contact information and the existence and location of any security cameras. In addition, Police Chief believed the Police Department would benefit from having "face time" with the managers of local businesses, as it would demonstrate that the Police Department was concerned about their businesses. (Commission Finding of Fact (FOF) ¶ 3; Notes of Testimony (N.T.) at 66, Reproduced Record (R.R.) at 67a.) Police Chief discussed the assignment with Officer. Officer questioned whether the assignment was "that great of an idea" given that "the information hasn't really been relevant," and it tended to get "stale quickly." (FOF ¶ 4; N.T. at 66, R.R. at 67a.) Police Chief, however, reiterated that he wanted the assignment completed. (FOF ¶ 4.) On Friday, January 27, 2017, Officer sent the following e-mail to Police Chief, as well as all Police Department employees:

> By default, I have been given the new title of "Business Liaison Officer". I know you all are jealous and feel slighted that you weren't chosen for this promotion, but let's face it . . . you can't all be as good

2

as me.  I'm still in the process of negotiating the wage increase but I have a feeling it will be substantially higher than the "Crossing Guard Liaison Officer" position that [another officer] chose over this one.  So, with that said, I am going to begin the arduous journey of compiling tons of useless phone numbers, names, and other irrelevant information that will be outdated by the time I finish.  HAHAHAHA

So my question to all of you is what information can I, as the Business Liaison Officer, get from these businesses that will help you in performing your jobs easier when you go to calls.  Please keep the responses short . . . 5 or 6 paragraphs will do.

Business Liaison Officer Charles Kern.

(FOF ¶ 5; R.R. at 153a.)  Police Chief read the e-mail and then, on Monday, January 30, 2017, forwarded it to the Borough Mayor, who is head of the Police Department, because he believed the e-mail was unprofessional and disrespectful and to inform the Borough Mayor that he was considering recommending that Officer be disciplined.

### B. Disciplinary Proceedings

On Thursday, February 2, 2017, Police Chief met with the Union Steward about the e-mail and explained that he was considering recommending disciplinary action against Officer.  For support, Police Chief pointed to Chapter II, Section 17 of the Police Department's Policy and Procedures Manual (Chapter II, Section 17), which lists, as duties and responsibilities of Borough police officers, that they "[b]e civil and respectful to their superiors . . . courteous and considerate," and directs them to "[r]efrain from all communication that discredits . . . superiors."  (FOF ¶ 9.) Prior to meeting with Officer, Police Chief gave Union Steward an opportunity to discuss the matter with Officer.  Police Chief, Officer, and Union Steward then met. Police Chief did not present Officer with written charges, but he stated that he

believed Officer's e-mail violated Chapter II, Section 17 and could subject Officer to discipline. Officer responded that he did not intend for the e-mail to be disrespectful but that he was simply trying to gather information from the other officers in a lighthearted manner. Police Chief directed Officer to write a memorandum to explain his actions, which Officer submitted on February 2, 2017. The memorandum read,

> Chief, I am responding in regards to our conversation regarding the "Business Liaison Officer" e[-]mail that I sent to the department last week. I in no way intended the e[-]mail to be insubordinate or undermine the task in [sic] which you assigned to me. I was writing in a joking manner to the guys, trying to be funny while asking for their input. I apologize for the perceived insubordination that it may have appeared to you or others. It honestly was not meant to be that way. I have begun the task that you requested and will keep you updated as to its progress.

(R.R. at 154a.) At the end of the meeting, Police Chief said that they would have another meeting that afternoon; however, Officer was unavailable at that time. The next day, Police Chief consulted with Union Steward who agreed that the due process requirements of *Loudermill* had been satisfied and, consequently, no subsequent meeting was held.

On February 4, 2017, Police Chief requested that the Borough Council take disciplinary action in the following memorandum:

> After consulting with the Mayor, I did an investigation of the facts. I conducted a Loudermill hearing on February 2, 2017 with [Officer] and his union representative . . . . [Officer] admitted sending the e[-]mail, but stated he meant no malice or offense, and had intended it to be taken as a joke. I directed him to submit a memorandum regarding the incident, which is also attached. [Union Steward] had been informed of the nature of the offense immediately prior to the hearing, and I spoke with him during the morning of February 3, 2017 and confirmed

4

the union was in agreement [that] the requirements of Loudermill . . . had been met during our interactions the previous day.

(R.R. at 151a-52a.)

On February 6, 2017, before a meeting of the Borough Council, Police Chief recommended a one-day suspension for Officer's conduct. The Borough Council voted to impose a one-day suspension on Officer.

The following day, the Borough Council issued a Notice of Suspension and Statement of Charges to Officer informing him that his conduct violated Chapter II, Section 17, and warranted a suspension of **one day**.

### C. Officer's Appeal to the Commission

Pursuant to Section 1190(c) of the Borough Code, 8 Pa. C.S. § 1190(c),[3] Officer elected to appeal the suspension to the Commission. Before the Commission, the primary issue was whether the meeting of February 2, 2017, between Police Chief, Officer, and Union Steward satisfied the due process requirements of a PDC as established in *Loudermill*.

At the outset of the hearing, Officer, pro se, read into the record his motion to "dismiss the action pending against him" because his due process rights had been violated. (N.T. at 9-13, R.R. at 10a-14a; Trial Ct. Record at 153-55.) Officer argued that he had not been afforded a PDC consistent with the due process requirements established in *Loudermill*, and there was no emergency that justified his suspension without a proper PDC. The Commission deferred decision on Officer's motion until

---

[3] Section 1190(c) provides, in pertinent part, that after a written statement of charges has been provided, a "person shall have ten days from the date of receiving the notice to submit a written request for a hearing to the civil service commission . . . ." 8 Pa. C.S. § 1190(c).

5

testimony could be taken because issues of fact existed as to what transpired at the PDC.

The Commission then heard the testimony of Union Steward, Police Chief, and Officer.

Union Steward testified as follows. His role is to act as the voice of the union and as a liaison between the police department officers and the union. On February 2, 2017, Police Chief called Union Steward into his office and showed Officer's e-mail to Union Steward. Police Chief told Union Steward that he considered the e-mail insubordinate and that Police Chief was "going to proceed with discipline." (R.R. at 34a-35a.) Police Chief directed Union Steward to retrieve Officer for a meeting. When Union Steward spoke with Officer and informed him that Police Chief considered the e-mail insubordinate, Officer "was completely shocked . . . that this e-mail was being taken as insubordinate" because he did not intend it to be insubordinate. (R.R. at 39a-40a, 55a-56a.) At the meeting between Police Chief, Officer, and Union Steward, Police Chief explained that he felt the e-mail was insubordinate and that "he was going to take it upstairs," which, Union Steward explained, meant that the Borough Council was going to decide if Officer should be disciplined because, according to the Police Department's own rules and regulations, Police Chief could not unilaterally impose discipline. (R.R. at 34a, 36a, 42a, 59a.) Officer explained during the meeting that the e-mail "was an attempt at humor." (R.R. at 39a, 42a.) Police Chief directed Officer to write a memorandum to "say what he was thinking." (R.R. at 37a.) At the end of the meeting, Police Chief said that there would be another meeting that "afternoon[] after he went upstairs" with Officer's memorandum. (R.R. at 38a.) However, that afternoon, Police Chief called Union Steward and told him that another meeting was unnecessary because the

6

meeting in the morning sufficed to satisfy the requirements of *Loudermill*, and Officer "said everything that he thinks he needs to say." (R.R. at 38a.) Union Steward testified that he "wasn't abreast of all of the things of Loudermill hearings." (R.R. at 54a.)

Police Chief testified as follows. On February 2, 2017, he first met with Union Steward and showed him Officer's e-mail. Police Chief and Union Steward "had a long discussion about the e-mail and [its] contents." (R.R. at 71a.) Union Steward expressed to Police Chief that he thought that Officer was "trying to be funny" and not disrespectful. (*Id.*) Police Chief showed Union Steward Chapter II, Section 17, and they agreed that this "would be a relevant section." (*Id.*) Police Chief then gave Union Steward an opportunity to speak with Officer "in private" before Police Chief met with Officer and Union Steward. (R.R. at 72a.) At the meeting between Police Chief, Officer, and Union Steward, Officer explained that he did not intend to be disrespectful, but was trying to obtain the information Police Chief wanted, albeit in a "joking," "lighthearted" manner. (R.R. at 72a-73a.) Police Chief did not present Officer with "formal charging documents," but Police Chief did reference Chapter II, Section 17, and he "detailed the process" for disciplinary action. (R.R. at 73a, 81a.) Police Chief explained that he could not impose discipline; rather, he could only recommend to the Borough Council that an officer be disciplined. Police Chief directed Officer to write a memorandum, which Officer did. At the end of the meeting, Police Chief said he would meet again with Officer and Union Steward at the end of the day shift, around 2:45 p.m. However, when Police Chief spoke with Union Steward, Union Steward said that Officer was in two preliminary hearings and thus unavailable. Police Chief replied, "we will see if we have to do this tomorrow." (R.R. at 75a.) On February 3, 2017, Police Chief again spoke with

7

Union Steward, asking him what else were they "going to do in this hearing?" (*Id.*) Police Chief asked Union Steward "if he felt that the tenets of the Loudermill [hearing] had been met," and Union Steward agreed that the requirements of *Loudermill* had been met and a subsequent meeting was unnecessary. (*Id.*) As a result, no further meeting was held. Police Chief then recommended to the Borough Council that Officer be suspended for one day.

Officer testified on his own behalf as follows. At the meeting with Police Chief on January 20, 2017, where Officer was assigned the task of Business Liaison Officer, the general tenor of the meeting was joking. Officer's e-mail was "a continuance of that initial conversation." (R.R. at 122a.) On cross examination, in light of Officer's motion to dismiss, Borough Attorney asked what Officer would have done differently at the PDC had Police Chief provided him with written charges. (R.R. at 127a.) Officer answered that he would have told Police Chief, as he had done in his direct testimony, of the "jovial nature" of the January 20, 2017 meeting and, then, when the Borough Council received Police Chief's memorandum recommending discipline, the Borough Council would have had Officer's "side of the story." (*Id.*) When Borough Attorney noted that Officer had provided a written memorandum following the PDC, Officer responded that his memorandum had "no detailed information" and "was more or less an apology." (R.R. at 127a-28a.) Officer explained that, after discussing the matter with Union Steward, Officer thought it would be best simply to apologize in the hope that Police Chief would keep the matter "in-house" and "move on." (R.R. at 128a.) Officer stated that Police Chief told him to write what was discussed at the January 20, 2017 meeting, and what they discussed was, "[h]ey, I'm sorry, I didn't mean for you to interpret it this way." (R.R. at 128a-29a.) Officer agreed with Borough Attorney that there was no

8

limitation placed on him as to what he could have included in his memorandum. (R.R. at 128a.)

Following the hearing, the Commission issued its Decision and Order. The Commission rejected Officer's argument that his due process rights were violated at the PDC. (Commission Decision and Order at 4-5.) The Commission noted that "[a]t all relevant times Officer" knew Police Chief was considering recommending Officer be disciplined and Police Chief's reasons for doing so. (*Id.* at 5.) Further, the Commission noted, Officer was given an opportunity to explain his conduct and that explanation had remained the same throughout the proceedings. (*Id.*) The Commission concluded that due process did not require Officer be provided with a written statement of the charges at the PDC, reasoning that the purpose behind the PDC was to give the employee an opportunity to explain his side of the story before a decision on whether to impose discipline was made. (*Id.*) Given the foregoing, the Commission found due process had been satisfied.

The Commission also concluded that Officer's e-mail violated Chapter II, Section 17, his conduct constituted intemperance and was unbecoming an officer, and a one-day suspension without pay, being supported by the evidence, was neither arbitrary nor discriminatory. (*Id.* at 6-7.)

### D. Officer's Appeal to Common Pleas

Officer appealed to common pleas, which sustained the appeal. Common pleas' opinion, issued pursuant to Rule 1925(a) of the Pennsylvania Rules of Appellate Procedure, Pa.R.A.P. 1925(a), explained that Officer was deprived of his due process rights because "he was not given notice of the charges against him at a meaningful time, giving him a date, time and place to respond" and, further, once at

9

the PDC, Officer "was not charged, and he was led to believe that he would be afforded another meeting." (Common Pleas 1925(a) Opinion at 9.) Common pleas noted that Officer was taken directly to the PDC with no notice. Best and common practice was, common pleas stated, to provide an employee with a letter, 24 hours before the PDC, so that the employee would have time to prepare. (*Id.* at 6.) At the PDC, common pleas recounted, Police Chief did not charge Officer. In fact, Police Chief stated that Officer and Union Steward would need to return for a second meeting, but Police Chief concluded that no additional meeting was necessary, and Union Steward agreed because he was not familiar with the requirements of *Loudermill*. (*Id.* at 6-7.) The PDC, common pleas concluded, was merely a "pro forma meeting." (*Id.* at 7.) As a result of the lack of due process, the Borough Council had before it only Officer's memorandum, which was an "apology e-mail," and Police Chief's version of the events, which did not include the fact that the conversation between Officer and Police Chief on January 20, 2017, when Officer was assigned the task of Business Liaison Officer, was "humorous." (*Id.* at 7.)

Borough now appeals to this Court.

## II. Discussion

### A. Arguments on Appeal

On appeal,[4] Borough contends that Officer was afforded a PDC consistent with the requirements of *Loudermill*. According to Borough, Officer was given

---

[4] Where, as here, a complete record was made before the Commission, our standard of review is limited to determining whether constitutional rights were violated, whether an error of law was committed, or whether necessary findings of fact are supported by substantial competent evidence. Section 754(b) of the Local Agency Law, 2 Pa. C.S. § 754(b); *Johnson v. Lansdale Borough*, 180 A.3d 791, 799 (Pa. Cmwlth.), *petition for allowance of appeal denied*, 195 A.3d 853 (Pa. 2018).

10

timely notice of the PDC. Contrary to common pleas' conclusion, Borough argues, it was not required to give Officer advance notice of the charge against him. The notice Police Chief gave Officer at the outset of the PDC was sufficient to satisfy due process. Further, Borough argues, Police Chief afforded Officer multiple opportunities to respond to the charge against him, first orally at the PDC, and then in writing after the PDC. In both instances, Borough contends, Officer knew that Police Chief was recommending discipline and his reasons for doing so.

Officer, pro se, argues that Borough's argument that advance notice of the charge was not required is misplaced because he was never given actual notice of the charge. Rather, Police Chief made "a basic accusation" against Officer and offered Officer "the option to provide his . . . opinion on the subject." (Officer's Brief at 6.) Indeed, according to Officer, Police Chief told Officer that he had not filed any charge against Officer, and that there would be another meeting after Police Chief "took the matter upstairs," apparently meaning that Police Chief would discuss the matter with the Borough Mayor or legal counsel before determining whether any discipline was appropriate. (*Id.*) Officer argues that Police Chief's statement that he was considering disciplinary action is not the same as actually taking disciplinary action. In short, Officer argues, the notice requirements of *Loudermill* required that Officer be actually charged and, thus, notice was not met when Police Chief said he was considering having Officer charged. Further, Officer contends, he was not afforded the opportunity to respond to Police Chief's allegations. The PDC, Officer argues, was just an investigatory interview conducted so as to determine if discipline might be imposed at some later date. As a result, Officer's response to the PDC was informal and incomplete.

11

**B. Analysis**

"An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and an opportunity for hearing appropriate to the nature of the case.'" *Loudermill*, 470 U.S. at 542 (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950)). In balancing the competing interests of the employee and the governmental employer – "the private interests in retaining employment, the governmental interest in the expeditious removal of unsatisfactory employees and the avoidance of administrative burdens, and the risk of an erroneous termination" – the Supreme Court concluded in *Loudermill* that an employee is entitled to "some kind of hearing." *Id.* at 542-43 (citation omitted). However, while "some kind of hearing" is required, it "need not be elaborate." *Id.* at 545. The type of hearing required will depend on "the importance of the interests involved and the nature of the subsequent proceedings." *Id.* (citation omitted). In general, though, "something less than a full evidentiary hearing is sufficient prior to adverse administrative action," particularly where, as here, post-termination proceedings allow for "a full administrative hearing and judicial review." *Id.* (citation omitted). The essential requirements are three-fold: "oral or written notice of the charges against [the employee], an explanation of the employer's evidence, and an opportunity to present [their] side of the story." *Id.* at 546. The purpose of the "hearing" is "not [to] definitively resolve the propriety of the discharge." *Id.* at 545. Rather, "[i]t should be an initial check against mistaken decisions – essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the **proposed action**." *Id.* at 545-46 (emphasis added). As we have stated, the purpose of a PDC is to give the employee "the opportunity to respond to **allegations** . . . **before** [the employee] is deprived of

12

[a] significant property interest." *Pavonarius v. City of Allentown*, 629 A.2d 204, 207 (Pa. Cmwlth. 1993) (emphasis added).[5]

"Notice is sufficient . . . if it apprises the vulnerable party of the nature of the charges and general evidence against" them, and "is timely under the particular circumstances of the case." *Antonini v. W. Beaver Area Sch. Dist.*, 874 A.2d 679, 686 (Pa. Cmwlth. 2005) (citing *Gniotek v. City of Philadelphia*, 808 F.2d 241, 244 (3d Cir. 1986)). In other words, the notice must be "of such specificity to allow [the employee] the opportunity to determine what facts, if any, within [their] knowledge might be presented in mitigation of or in denial of the charges." *Gniotek*, 808 F.2d at 244. **Advance notice, however, is not required**. *Antonini*, 874 A.2d at 686. Notice given at the time of a PDC may satisfy due process. *Gniotek*, 808 F.2d at 244. "'[T]he timing and content of notice . . . will depend on appropriate accommodation of the competing interests involved.'" *Antonini*, 874 A.2d at 686 (quoting *Gniotek*, 808 F.2d at 244).

Applying these principles here, Officer was not deprived of due process because of a lack of notice. As we have set forth, due process does not require that advance notice be given in every instance and, contrary to common pleas' suggestion, the circumstances of this case did not warrant 24 hours' advance notice. Nevertheless, Police Chief provided Officer with some advance notice that he considered Officer's e-mail insubordinate, in violation of Chapter II, Section 17, and was considering recommending that the Borough Council impose discipline against Officer. As recounted in the testimony before the Commission, Police Chief first spoke with Union Steward about Officer's e-mail and explained that he was

---

[5] The right to "some kind of hearing," *Loudermill*, 470 U.S. at 542, applies to an employee regardless of whether he is facing termination or suspension. *Jaruszewicz v. Dep't of Envtl. Res.*, 648 A.2d 1285, 1288 (Pa. Cmwlth. 1994).

considering recommending disciplinary action against Officer because he thought the e-mail was insubordinate. (R.R. at 39a-41a, 69a-72a.) Police Chief then gave Union Steward an opportunity to discuss the matter with Officer "**in private**" before the PDC was commenced. (R.R. at 72a (emphasis added)); *see Copeland v. Phila. Police Dep't*, 840 F.2d 1139, 1145 (3d Cir. 1988) (finding no due process violation where the officer's commanding officer told him before his PDC that a urinalysis showed that the officer had tested positive for marijuana and an inspector told the officer of this finding at the PDC). Moreover, the PDC occurred in temporal proximity to Officer's sending of the e-mail, only one week. The events, therefore, were still fresh in Officer's mind, and he did not need a lengthy amount of time "to gather his thoughts and his evidence and to make an informed decision about the best way to respond to the charges." *Staples v. City of Milwaukee*, 142 F.3d 383, 386 (7th Cir. 1998); *cf. Morton v. Beyer*, 822 F.2d 364, 371 n.11 (3d Cir. 1987) (where there was a "significant lapse in time between the alleged improper conduct and the" PDC, the employee "should have been provided sufficient time . . . to recount the facts in his own mind" so as "to prepare himself to demonstrate . . . that reasonable grounds to believe that the charges were true did not exist"). Indeed, Officer's response to the allegations has remained the same. Consistently at the PDC, in the post-PDC memorandum Officer sent Police Chief, and in Officer's testimony before the Commission, Officer's defense has always been that he did not intend to be insubordinate and was attempting to be humorous, and he apologized for any perceived insubordination. Because Officer was given some advance notice of the allegations against him and the events occurred in temporal proximity, he had sufficient time to enable him to prepare a defense and, therefore, notice was timely under the circumstances.

14

Officer contends, however, that the issue of the timeliness of notice is irrelevant because he was never given actual notice of the charge. In other words, Officer suggests that he had to be presented with a formal charge at the PDC. However, adequate notice does not require the filing of formal charges. In *Gniotek*, several police officers were suspected of accepting bribes. 808 F.2d at 242. At a PDC, each officer was provided a form stating, "[w]e are questioning you concerning testimony presented in Federal Court under oath by . . . an admitted number writer, that he paid you $60 per month for an extended period beginning in 1982 for protection of his illegal activities." *Id.* at 244. The Third Circuit held that "[t]his statement, clearly, gave [the officer] notice of the charges and nature of evidence against him." *Id.* The form was sufficiently specific, the court continued, to allow the officer "the opportunity to determine what facts, if any, within his knowledge might be presented in mitigation of or in denial of the charges" and, thus, due process was satisfied. *Id.*

In *Copeland*, a police officer met with an Internal Affairs Bureau investigator who at that meeting, informed the officer that, based on a urinalysis, he had tested positive for marijuana. 840 F.2d at 1142. At the end of the meeting, the investigator informed the officer that he "was suspended with intent to dismiss." *Id.* The Third Circuit rejected the officer's argument that he was deprived of due process because the City of Philadelphia did not prepare formal, written charges against him until after he had been dismissed. *Id.* at 1145. The court reasoned that the officer was given notice and a hearing on his use of an illegal drug prior to his dismissal, which was ultimately the charge that resulted in his dismissal. *Id.* at 1145-46; *see also Schmidt v. Creedon*, 639 F.3d 587, 599-600 (3d Cir. 2011) (holding that where the notice "described in sufficient detail the conduct that was the basis for [the officer's]

15

suspension," the fact that the notice did not identify the specific rule the officer violated did not deprive him of due process).

Persuaded by these cases, we also conclude that Officer was not deprived of due process merely because he was not formally charged at the PDC. As the testimony showed, Officer was well aware that Police Chief was considering recommending to the Borough Council that Officer be disciplined. (FOF ¶ 11.) Moreover, Officer knew that Police Chief was considering recommending discipline because of Officer's e-mail, which Police Chief believed was insubordinate and in violation of Chapter II, Section 17. (R.R. at 39a-41a, 73a.) It was Chapter II, Section 17, which the Borough Council cited for imposing the one-day suspension. (*Id.* at 150a.) In short, the oral notice Police Chief provided Officer apprised him of the nature of the charge against him, and the lack of a formal charge did not deprive Officer of due process because he was afforded "[t]he opportunity to present reasons . . . why [the] **proposed action** should not be taken." *Loudermill*, 470 U.S. at 546 (emphasis added).

Finally, Officer was not deprived of due process because of a lack of a meaningful opportunity to respond. Officer "present[ed] his side of the story," both at the PDC and in writing after the PDC, stating that he did not intend to be insubordinate and that he was attempting to be humorous, and he apologized for any perceived insubordination. *Id.* (stating that "[t]he opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement"). As already noted, Officer's defense of his action has been consistent from the PDC, to the post-PDC memorandum he sent Police Chief, to his testimony before the Commission. The only difference the Officer has cited, as explained in his testimony, was that, according to him, had a

16

proper PDC been held, he would have explained that the meeting where Police Chief assigned Officer to work as the Business Liaison Officer was of a "jovial nature." (N.T. at 126, R.R. at 127a.) Nothing, however, prevented Officer from explaining the nature of the meeting either at the PDC or in his post-PDC memorandum. Thus, Officer had the opportunity to present this fact but, for whatever reason, chose not to do so.

While Officer cites to *Jaruszewicz v. Department of Environmental Resources*, 648 A.2d 1285 (Pa. Cmwlth. 1994), in support of his argument that he was deprived of a meaningful opportunity to respond in that the PDC was merely an investigatory meeting and Officer anticipated a second PDC, *Jaruszewicz* is distinguishable. There, a Department of Environmental Resources (DER) park ranger was suspected of having encouraged the girlfriend of a colleague who had been killed to sue the Commonwealth for his death. *Id.* at 1286. The assistant park manager investigating the incident met with the park ranger twice but revealed the identity of the park ranger's accuser only at the second meeting. *Id.* at 1288. At the second meeting, during which the park ranger identified members of her family that might have witnessed the conversation the park ranger had with the girlfriend, the assistant park manager told the park ranger that he would investigate further and possibly convene the parties at the next meeting. *Id.* However, no additional meeting was held, and the park ranger was suspended after the assistant park manager spoke only to the girlfriend's witness, and not the park ranger's family members. *Id.* We held that the park ranger's pre-disciplinary rights were violated because she "was not given an adequate opportunity to respond to the complaint against her before she was formally suspended." *Id.* at 1289. We stated that while the park ranger had "an opportunity to respond to the complaint against her at the

17

second meeting," the assistant park manager's "actions also left the impression that he would be holding another meeting prior to taking disciplinary action," which "stripped [the park ranger] of the opportunity to fully respond to the complaint[.]" *Id.*

Here, though, the circumstances do not involve the recollection of several witnesses to a conversation, some of whom were not questioned by the governmental employer. The facts have been largely undisputed, and the only question has been Officer's intent behind the e-mail and how others who received the e-mail perceived it.[6] In addition, unlike in *Jaruszewicz*, where the impression was left that another meeting would be held, here, after Police Chief gave that impression, he consulted with Union Steward, and Union Steward agreed that no additional meeting was necessary. Moreover, as previously discussed, Officer had a meaningful opportunity to respond to Police Chief's allegation that Officer's e-mail was insubordinate. Therefore, Officer's right to a meaningful opportunity to respond was not violated.

---

[6] The Commission ultimately concluded that even if Officer intended the e-mail to be a joke, it "was still inappropriate, disrespectful and intemperate." (Commission Decision and Order at 6.) The Commission highlighted that while Officer asserted "the e[-]mail was meant to be an extension of [the] cordial and joking tone" of the January 20, 2017 meeting, the January 20, 2017 meeting was a "private discussion" between Officer and Police Chief, whereas the "e[-]mail was sent to **all** employees of the Department who were not aware of the alleged tone and tenor of any previous private conversations between" Officer and Police Chief. (*Id.* (emphasis in original).) Therefore, recipients of the e-mail "could only interpret [it] based on its content." (*Id.*)

18

## III. Conclusion

For the foregoing reasons, we conclude that prior to the imposition of the one-day suspension, Officer was afforded his constitutional right to due process at the PDC. Accordingly, we must reverse the Order of common pleas and reinstate the Commission's order sustaining the one day suspension of Officer.

_____
**RENÉE COHN JUBELIRER,** Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Charles Kern                                    :
                                                :
              v.                                : No. 1877 C.D. 2017
                                                :
Green Tree Borough and Green Tree              :
Borough Civil Service Commission,              :
                        Appellants             :

# **O R D E R**

**NOW**, January 31, 2019, the December 7, 2017 Order of the Court of Common Pleas of Allegheny County is **REVERSED**, and the order of the Green Tree Borough Civil Service Commission is **REINSTATED**.

_____
**RENÉE COHN JUBELIRER,** Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Charles Kern                           :
                                       :
            v.                         :  No. 1877 C.D. 2017
                                       :  Submitted: August 10, 2018
Green Tree Borough and Green           :
Tree Borough Civil Service             :
Commission,                            :
                  Appellants           :


BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge
           HONORABLE RENÉE COHN JUBELIRER, Judge
           HONORABLE ELLEN CEISLER, Judge

<u>OPINION NOT REPORTED</u>

DISSENTING OPINION
BY PRESIDENT JUDGE LEAVITT                          FILED: January 31, 2019

        Respectfully, I dissent.  The due process requirements established in
*Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985), are not very
onerous, but they do require the public employee to be informed of the discipline
under consideration.  Here, Officer Kern was not informed that he could be
suspended either before or at the meeting with Green Tree Borough's Police Chief,
Colin Cleary.  Because I agree with the Court of Common Pleas of Allegheny
County's (trial court) determination that Officer Kern did not have a *Loudermill*
hearing, I would affirm.

        As noted by the majority, *Loudermill* requires notice and the
opportunity to be heard before a public employee's employment can be terminated.
In *Loudermill*, two discharged school district employees brought actions against
their respective boards of education to challenge the termination of their
employment.

The United States Supreme Court held that a government employee has a property interest in his employment, and, thus, is entitled to a pre-termination hearing that satisfies due process, *i.e.*, notice and the opportunity to be heard. *Loudermill,* 470 U.S. at 542. This pre-termination hearing "need not be elaborate"; in general, "'something less' than a full evidentiary hearing is sufficient prior to adverse administrative action." *Id.* at 545 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 343 (1976)). The pre-termination hearing serves as "an initial check against mistaken decisions – essentially a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." *Id.* at 545-46.

In *Ray v. Civil Service Commission of Borough of Darby*, 131 A.3d 1012 (Pa. Cmwlth. 2016), we considered whether the borough's pre-termination hearing complied with the notice requirement of *Loudermill*. In *Ray*, the police chief notified an officer, in writing, that his conduct had violated departmental rules and that he could be disciplined in a way that would affect his earnings. A *Loudermill* hearing was scheduled and attended by the officer and his counsel. One day later, the chief notified the officer that he had been suspended and that the chief planned to recommend that the borough council terminate the officer's employment. The officer appealed, contending that the written notice of charges was inadequate because it did not specifically state that a suspension or termination was a possibility. We rejected this contention. We held that the notice was sufficient because it stated that the officer "may be subject to disciplinary action that could affect [his] pay." *Ray*, 131 A.3d at 1020.

Unlike the officer in *Ray*, Officer Kern did not receive a written statement of charges, let alone notice that he could be disciplined in a way that would

affect his pay. Officer Kern testified that he was not informed at the meeting that he might be suspended or subject to a wage loss, and Chief Cleary did not refute this testimony. Likewise, Officer Kern was not advised that a suspension would be on his record for three years and could hinder his ability to be promoted. Notes of Testimony (N.T.), 9/12/2017, at 3. Because Officer Kern was not informed either before or during the meeting that he could be suspended, I agree with the trial court's conclusion that Officer Kern did not receive the minimum notice required by *Loudermill*.

In addition, Officer Kern was not given an adequate opportunity to respond. Chief Cleary told Officer Kern that he would hold a second meeting after Officer Kern and his Union Steward, Officer Jerome Geiger, had the opportunity to consult with their union representative. N.T., 3/1/2017, at 74. The trial court found that all three men believed there would be another meeting. Instead, Chief Cleary cancelled the second meeting. Officer Kern, relying on *Jaruszewicz v. Department of Environmental Resources*, 648 A.2d 1285 (Pa. Cmwlth. 1994), argues that as a result of the cancellation of the second meeting, he did not receive a complete opportunity to respond, as required by *Loudermill*.

In *Jaruszewicz*, the department gave the public employee the impression that another meeting would take place. This Court concluded that the department "stripped [the employee] of the opportunity to fully respond to the complaint prior to [the deprivation] *by indicating to* [the employee] *that she would have such an opportunity at another meeting* and then not holding such a meeting." *Jaruszewicz*, 648 A.2d at 1289 (emphasis added). Chief Cleary told Officer Kern there would be another meeting. The majority concludes that this does not matter because Chief Cleary and Officer Geiger agreed that another meeting was not

MHL-3

necessary. I disagree with this conclusion. First, Officer Geiger did not have the authority to waive Officer Kern's *Loudermill* rights. Second, the majority does not consider how the lack of a second meeting affected Officer Kern's *Loudermill* rights. Had the second meeting occurred, Officer Kern could have provided a complete explanation of his conduct before Chief Cleary forwarded his recommendation to the Borough Council.

Chief Cleary asked Officer Kern to write the memorandum about his email, and Officer Kern composed the memorandum as an apology to Chief Cleary. He did not use it as a means to present his side of the story. Although Officer Kern acknowledged that no one placed limitations on the content of his memorandum, he testified that Chief Cleary told him to simply write a "to/from" *to Chief Cleary* about the intent of Officer Kern's email. N.T., 3/1/2017, at 127-28. Chief Cleary did not say that the memorandum would be forwarded to a third party.

It would have been a simple matter for Chief Cleary to issue a brief, written statement of charges and ask Officer Kern at the February 2, 2017, meeting to explain why he should not be suspended. Had this information been conveyed, Officer Kern could have written a more complete response and explained that the humor in his email simply continued the tone of his earlier meeting with Chief Cleary. This may have caused Chief Cleary to recommend a reprimand instead of a suspension. With a more complete explanation, the Borough Council may not have accepted Chief Cleary's recommendation for a one-day suspension and imposed a different sanction, or no discipline at all.

In summary, the standards for a *Loudermill* hearing are not difficult to satisfy. Because Chief Cleary's oral statement of charges did not inform Officer Kern that he could be disciplined in a way that would affect his wages, it did not

satisfy the minimum notice requirement of *Loudermill*.  *Ray*, 131 A.3d at 1020. Even Chief Cleary had doubts about whether his meeting with Officer Kern satisfied *Loudermill*, which is why he sought assurance from Officer Geiger, who testified before the trial court that he did not understand *Loudermill* requirements.

For these reasons, I would affirm the trial court's decision.

_____
MARY HANNAH LEAVITT, President Judge